No. 25-11027

# In the United States Court of Appeals for the Eleventh Circuit

ZHIPENG YIN, ET AL.,
*Plaintiffs-Appellees,*

v.

COMMISSIONER, FLORIDA
DEPARTMENT OF EDUCATION, ET AL.,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of Florida
No. 1:24-cv-21129-JEM-EIS

## APPELLANTS' INITIAL BRIEF

JAMES UTHMEIER
 *Attorney General of Florida*

JEFFREY PAUL DESOUSA
 *Acting Solicitor General*
NATHAN A. FORRESTER
DAVID M. COSTELLO
 *Chief Deputy Solicitors General*
ROBERT S. SCHENCK
CHRISTINE PRATT
 *Assistant Solicitors General*
 PL-01, The Capitol
 Tallahassee, FL 32399-1050
 (850) 414-3300
 *jeffrey.desousa@myfloridalegal.com*

May 12, 2025                    *Counsel for Defendants-Appellants*

*Yin v. Commissioner*
*Eleventh Circuit Case No. 25-11027*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Defendants certify that, to the best of their knowledge, the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3:

1.    Arcila, Fabio

2.    Barnett, Ashley Bell

3.    Cerio, Tim

4.    Chinian, Saba

5.    Costello, David

6.    DeSousa, Jeffrey

7.    Diaz, Manny

8.    Edge, Aubrey

9.    Forrester, Nathan

10.    Guan, Zhengfei

11.    Guo, Zhen

12.    Haddock, Edward

13.    Henry, Chad

14.    Hitchcock, Jack

15.    Jones, Ken

C-1 of 3

16.    Lamb, Brian

17.    Levine, Alan

18.    Lydecker, Charles

19.    Mateer, Craig

20.    Martinez, The Honorable Jose E.

21.    Oliva, Jose

22.    Pang, Evelyn

23.    Perez, David

24.    Phalin, Amanda

25.    Pratt, Christine

26.    Rodrigues, Raymond

27.    Sanchez, The Honorable Eduardo

28.    Schenck, Robert

29.    Silagy, Eric

30.    Swartz, Rodney

31.    Tilley, Daniel Boaz

32.    Uthmeier, James

33.    Whitaker, Henry

34.    Yin, Zhipeng

35.    Zhu, Keliang

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

# ORAL ARGUMENT STATEMENT

Defendants respectfully request oral argument, which will help the Court decide the important legal issues raised by this case. In particular, this case presents critical questions of first impression about the enforceability of Florida's SB 846, a law designed to protect sensitive American technology and innovation from espionage and theft by totalitarian governments and their agents. The case also presents pressing questions about the propriety of granting universal, statewide injunctive relief that sweeps beyond the relief necessary to redress a plaintiff's injuries.

# TABLE OF CONTENTS

Oral Argument Statement ........................................................................................i

Table of Contents .................................................................................................. ii

Table of Authorities ........................................................................................... iv

Statement of Jurisdiction ......................................................................................1

Issues Presented ....................................................................................................2

Introduction ...........................................................................................................3

Statement of the Case ...........................................................................................5

      A.     Florida's SB 846 ....................................................................................5

      B.     The F-1 Visa Program ...........................................................................9

      C.     Plaintiffs ...............................................................................................15

      D.     Procedural History .............................................................................15

Standard of Review ..............................................................................................17

Summary of Argument ........................................................................................17

Argument ..............................................................................................................22

I.     Plaintiffs have failed to show that they are likely to succeed on the merits. ..............................................................................................................22

      A.     The student Plaintiffs lack standing because FIU, not the Board of Governors, is responsible for Plaintiffs' alleged injuries..............................................................................................................22

      B.     The F-1 visa program does not preempt SB 846. ......................................25

            1.     Federal regulations allowing student visa holders to pursue a "full course of custody" in the U.S. do not preempt SB 846. ........................................................................................26

            2.     The State Department's decision to grant an F-1 visa does not preempt SB 846. ..............................................................................30

3.    Federal foreign-affairs interests also do not preempt
SB 846. ................................................................................33

4.    Plaintiffs cannot meet the heavy burden to
demonstrate facial invalidity of SB 846. ............................................36

II.    The universal injunction exceeds the equitable powers of the
district court..............................................................................................38

III.    The balance of the equities and the public interest do not support
a preliminary injunction. ...........................................................................43

Conclusion..............................................................................................................44

Certificate of Compliance ......................................................................................46

Certificate of Service .............................................................................................47

# TABLE OF AUTHORITIES

**Cases**

*Abbott Lab'ys v. Brennan*,
    952 F.2d 1346 (Fed. Cir. 1991) ..................................................................25

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
    557 F.3d 1177 (11th Cir. 2009) ..................................................................17

*Am. Ins. Assoc. v. Garamendi*,
    539 U.S. 396 (2003) ....................................................................................34

*Arizona v. United States*,
    567 U.S. 387 (2012) ...........................................................4, 19, 25, 30, 31

*Barber v. Gov. of Ala.*,
    73 F.4th 1306 (11th Cir. 2023) ...................................................................17

*Bass River Assocs. v. Mayor*,
    743 F.2d 159 (3d Cir. 1984) ........................................................................37

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ..........................................................................5, 38, 40

*California v. Texas*,
    593 U.S. 659 (2021) ....................................................................................24

*Chamber of Com. v. Whiting*,
    563 U.S. 582 (2011) ....................................................................................26

*City of South Miami v. Gov. of Fla.*,
    65 F.4th 631 (11th Cir. 2023) .........................................................22, 23, 24

*Clark v. Allen*,
    331 U.S. 503 (1947) ...............................................................................20, 35

*CTS Corp. v. Waldburger*,
    573 U.S. 1 (2014) ........................................................................................19

*DeCanas v. Bica*,
    424 U.S. 351 (1976) ....................................................................................25

*Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*,
    950 F.3d 790 (11th Cir. 2020) ........................................................ 41, 42

*Dep't of Homeland Sec. v. New York*,
    140 S. Ct. 599 (2020) ........................................................................43

*Douglas v. Seacoast Prods., Inc.*,
    431 U.S. 265 (1977) ..........................................................................37

*Drummond Co. v. Conrad & Scherer LLP*,
    885 F.3d 1324 (11th Cir. 2018) ......................................................41

*Estrada v. Becker,*
    917 F.3d 12982 (11th Cir. 2019 ......................................................27

*Florida v. Dep't of Health & Human Servs.*,
    19 F.4th 1271 (11th Cir. 2021).............................................18, 40, 41

*Ga. Muslim Voter Project v. Kemp*,
    918 F.3d 1262 (11th Cir. 2019) ......................................................42

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) ..........................................................................25

*Georgia v. President of the U.S.*,
    46 F.4th 1283 (11th Cir. 2022).................................5, 18, 21, 38, 39, 40, 42, 44

*Hansberry v. Lee*,
    311 U.S. 32 (1940)..............................................................................38

*Honeyfund.com, Inc. v. Governor*,
    94 F.4th 1272 (11th Cir. 2024)........................................................42

*Int'l Refugee Assistance Project v. Trump*,
    857 F.3d 554 (4th Cir. 2017) ..........................................................41

*Jacobson v. Fla. Sec'y of State*,
    974 F.3d 1236 (11th Cir. 2020) .................................................. 22, 23

*Kansas v. Garcia*,
    589 U.S. 191 (2020) .................................................4, 20, 25, 28, 30, 31

*Kreipke v. Wayne State Univ.*,
807 F.3d 768 (6th Cir. 2015) ...................................................................25, 35

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ...........................................................................................22

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) ...........................................................................................38

*Maryland v. King*,
567 U.S. 1301 (2012) ...................................................................................22, 43

*McDonald's Corp. v. Robertson*,
147 F.3d 1301 (11th Cir. 1998) .......................................................................17

*McGuire v. Marshall*,
50 F.4th 986 (11th Cir. 2022) ....................................................................36, 37

*Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC*,
714 F.3d 1234 (11th Cir. 2013) .......................................................................36

*Metro. Life Ins. Co. v. Massachusetts*,
471 U.S. 724 (1985) .....................................................................................25, 35

*Murphy v. NCAA*,
584 U.S. 453 (2018) .....................................................................................26, 36

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
434 U.S. 1345 (1977) ...................................................................................22, 43

*Nken v. Holder*,
556 U.S. 418 (2009) ...........................................................................................17

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981)................................................................................................25

*Rodgers v. Bryant*,
942 F.3d 451 (8th Cir. 2019) ...........................................................................39

*Scott v. Donald*,
165 U.S. 58 (1897)..............................................................................................39

*Scott v. Donald*,
   165 U.S. 107 (1897) ...................................................................39, 40

*Scott v. Roberts*,
   612 F.3d 1279 (11th Cir. 2010) ..................................................................42

*Shames v. Nebraska*,
   323 F. Supp. 1321 (D. Neb. 1971) ...........................................................34, 35

*Shen v. Simpson*,
   687 F. Supp. 3d 1219 (N.D. Fla. 2023)........................................................34

*Siegel v. LePore*,
   234 F.3d 1163 (11th Cir. 2000) ..................................................................17

*Smith v. Swormstedt*,
   57 U.S. (16 How.) 288 (1853) ....................................................................38

*Statewide Detective Agency v. Miller*,
   115 F.3d 904 (11th Cir. 1997) ....................................................................42

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998)......................................................................................42

*Support Working Animals, Inc. v. Gov. of Fla.*,
   8 F.4th 1198 (11th Cir. 2021)......................................................................24

*Supreme Tribe of Ben Hur v. Cauble*,
   255 U.S. 356 (1921) ...................................................................................38

*Swain v. Junior*,
   961 F.3d 1276 (11th Cir. 2020) ..................................................................43

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ......................................................................41

*Trojan Techs., Inc. v. Pennsylvania*,
   916 F.2d 903 (3d Cir. 1990)........................................................................34

*United States v. Hansen*,
   599 U.S. 762 (2023) ...............................................................................21, 36

*United States v. Salerno,*
   481 U.S. 739 (1987) ........................................................................................26

*United States v. Tongo,*
   16 F.3d 1223, 1994 WL 33967 (6th Cir. 1994) ..........................................29

*Zschernigv. Miller,*
   389 U.S. 429 (1968) ...............................................................................33, 34

**Statutory and Constitutional Provisions**

8 U.S.C. § 1101........................................................................8, 9, 10, 26, 28, 30

8 U.S.C. § 1182.............................................................................................34, 35, 37

8 U.S.C. § 1201.................................................................................................. 13, 31

8 U.S.C. § 1227.................................................................................................. 14, 27

8 U.S.C. § 1255.................................................................................................. 14, 27

8 U.S.C. § 1324a............................................................................................... 14, 27

8 U.S.C. § 1621..........................................................................................20, 27, 28

8 U.S.C. § 1622..........................................................................................20, 27, 28

Fla. Stat. § 112.311.................................................................................................24

Fla. Stat. § 288.860................................................................................3, 7, 8, 9, 16, 23

Rules

Fed. R. Civ. P. 65..................................................................................................21

Fed. R. Civ. P. 23............................................................................................38, 39

**Regulations**

8 C.F.R. § 214.1................................................................................................14, 27

8 C.F.R. § 214.2.........................................10, 11, 13, 14, 19, 27, 28, 29, 32, 37

8 C.F.R. § 214.3........................................................................ 10, 11, 12, 29

**Other Authorities**

9 Foreign Affairs Manual 402.5-5 ..................................................................11

*Applying for a Visa to Travel to the United States,*
   U.S. Dep't of Homeland Security................................................. 11, 27

Bd. of Governors, State Univ. Sys. of Fla., *Activity with Foreign Countries of Concern*
   *Guidance Document for State University System Institutions* (2023) ..................................... 8, 9

Bureau of Consular Affairs, U.S. Dep't of State, *Online Nonimmigrant Visa Application*
   *DS-160 EXEMPLAR*.....................................................................13

*Certification*, U.S. Dep't of Homeland Security ........................................... 10, 27

Christopher Wray, *The Threat Posed by the Chinese Government and the Chinese Communist*
   *Party to the Economic and National Security of the United States,*
   FBI (July 7, 2020) ....................................................................... 5, 6, 8

*CS/CS/SB 846* (2023) .......................................................................7

*Employment*, U.S. Immig. and Customs Enforcement.........................................32

Fla. Senate, Comm. on Rules, *Bill Analysis and Fiscal Impact Statement,*
   *CS/CS/SB 846* (2023)...................................................................6

Mike Pompeo, *U.S. States and the China Competition,*
   U.S. Dep't of State (Feb. 8, 2020) .......................................................6

*Sample I-20 Form*, Dep't of Homeland Security.......................................... 12, 33

*Student Visa*, U.S. Dep't of State.......................................................... 12, 13

*The China Threat*, FBI..................................................................... 5, 8

*Transnational Repression*, FBI ..............................................................8

*USCIS Policy Manual*, U.S. Citizenship and Immig. Servs.,
   *Chapter 6—Employment*............................................................... 32, 33

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

The State of Florida enacted SB 846 to protect its citizens from nefarious foreign-government influence by barring hostile foreign governments and their potential agents from stealing sensitive information at Florida's public universities. The district court granted a universal, preliminary injunction after it found that Plaintiffs were likely to succeed in their claims that federal law preempts SB 846. The issues on appeal are:

1.      Whether Plaintiffs are likely to show that SB 846 is preempted in every application by (i) federal law's removal of federal penalties for employment of student aliens in the F-1 visa program; (ii) the light federal security-screening done by the State Department when issuing an F-1 visa; or (iii) the federal government's foreign-relations interests.

2.      Whether Plaintiffs have clearly established that the balance of the equities favors an injunction and that the public interest favors an injunction.

3.      Whether any injunction should be tailored to apply only to the parties in the case.

**INTRODUCTION**

In our federalist system, the States retain most governmental power unless and until Congress displaces the States' power. The district court here nevertheless enjoined a Florida law (SB 846), passed with unanimous bipartisan support, that puts modest limits on public universities collaborating with "foreign principal[s]" from a "[f]oreign country of concern": China, Russia, Iran, North Korea, Cuba, Venezuela, or Syria. Fla. Stat. § 288.860(1)(a)–(b)4, (3)(a)–(b). The statute does not prohibit that collaboration. It merely requires the State University System's Board of Governors to approve any on-campus employment for a "foreign principal," which it may do if the employment arrangement is "valuable to students" and "not detrimental to the safety or security of the United States or its residents." *Id.* § 288.860(3)(d). That statute tasks state universities seeking to hire foreign principals with applying for Board approval of employment of those individuals. The arrangements at issue—graduate assistantships—required Board approval because the applicants were domiciled in China and thus were "foreign principal[s]." *Id.* § 288.860(1)(b).

The district court grounded its preliminary injunction in an overzealous reading of federal immigration law. It viewed the statutes and regulations governing F-1 student visas as conflicting with any state effort to account for security risks posed by F-1 visa students when they seek employment at state universities. In essence, the court held that a state university must hire an alien student, no matter the security risks, because

3

years earlier the federal government gave that student an F-1 visa and ran a cursory background check.

This Court should vacate that injunction. At the gate, Plaintiffs lack standing, because they have sued the wrong party—the Board of Governors—instead of the university that actually denied them employment, all without that university submitting any application to the Board to approve or deny.

The relevant federal laws and regulations also do not conflict with SB 846. The district court found a conflict based on (1) the removal of federal penalties for a university's choice to employ an F-1 visa holder; (2) the cursory security review the U.S. State Department performs on foreign students who apply for F-1 visas; and (3) the potential foreign-affairs impact of SB 846. But "[i]nvoking some brooding federal interest[s] . . . does not show preemption." *Kansas v. Garcia*, 589 U.S. 191, 202 (2020). Nothing in the federal regulations here evinces the "clear and manifest purpose of Congress" to displace laws like SB 846. *Arizona v. United States*, 567 U.S. 387, 400 (2012) (cleaned up). Rather, Florida's regulation of its own hiring is in perfect harmony with the F-1 visa program because everything about the F-1 program turns on the discretionary choices of universities, meaning—for public universities—choices made by the State. Before a foreign student may even apply for an F-1 visa, he must be accepted for admission as a student at a qualifying university. And to qualify to accept alien students at all, a university must—at its own election—apply to and be certified by the Department of Homeland Security. In other words, the F-1 visa program preserves, rather

4

than displaces, the State's discretion in all aspects of education—including employment that attends that education.

Even if all that were wrong, this Court should still limit relief to the parties. The district court flouted longstanding equitable principles by issuing an injunction against all enforcement of SB 846 by the Board against any alien student in the State. An injunction limited to the named Plaintiffs would fully remedy their alleged harms and heed the guiding principle that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The Court should remind district courts (yet again) that universal relief, absent the rarest of circumstances not present here, violates the traditional norms of equity that bind a district court's equitable power. *Georgia v. President of the U.S.*, 46 F.4th 1283, 1303 (11th Cir. 2022).

## STATEMENT OF THE CASE

### A.    Florida's SB 846

In 2020, FBI Director Christopher Wray characterized "the counterintelligence and economic espionage threat from China" as "[t]he greatest long-term threat to our nation's information and intellectual property."[1] He explained that China had

---

[1] Christopher Wray, *The Threat Posed by the Chinese Government and the Chinese Communist Party to the Economic and National Security of the United States*, FBI (July 7, 2020), https://tinyurl.com/yckbhtje. That continues to be the FBI's view of China. *See The China Threat*, FBI, https://tinyurl.com/42t5wmtc (last visited May 12, 2025).

"pioneered an expansive approach to stealing innovation through a wide range of actors—including not just Chinese intelligence services but state-owned enterprises, ostensibly private companies," and "a whole variety of other actors working on their behalf," such as "graduate students and researchers," who are "targeting research on everything from military equipment to wind turbines to rice and corn seeds." Wray, *supra* note 1. Given the magnitude of the problem, Director Wray emphasized, the federal government "can't do it on [its] own; [it] need[s] a whole-of-society response." *Id.* The Secretary of State echoed the same sentiments, warning of China's "plan to recruit scientists and professors" to sell China "the know-how we have here."[2] Speaking to the National Governors Association, the Secretary advised that "China is not just a federal issue." *Id.* The State Department "need[s] your help," because "[w]hat China does in Topeka and Sacramento reverberates in Washington." *Id.*

The same year, the Florida House of Representatives' Select Committee on the Integrity of Research Institutions launched investigations after learning that the CEO of a state-funded cancer-research institute "and three other officers or research scientists had failed to disclose support from relationships with Chinese talent and research programs."[3] "Following that revelation, the University of Florida disclosed to the Select

---

[2] Mike Pompeo, *U.S. States and the China Competition*, U.S. Dep't of State (Feb. 8, 2020), https://tinyurl.com/2wrptkyh.

[3] Fla. Senate, Comm. on Rules, *Bill Analysis and Fiscal Impact Statement, CS/CS/SB 846* at 3 (2023), https://tinyurl.com/yfy7ek34 (discussing the Select Committee's work in 2020).

Committee that three of its research staff were under similar investigations." *Id.* The Select Committee then "undertook an extensive review of Florida's university-based research programs" and "found that Florida state research grants lacked certain requirements deemed reasonably necessary to ensure research integrity." *Id.*

In March 2021, the Legislature began to consider "legislation to combat foreign influence." *Id.* The goal was to "place strategic safeguards against foreign influence by strengthening institutional vetting and applying protections for Florida's institutions of higher education." *Id.*

That mission continued in 2023, when the Legislature enacted SB 846—the law challenged here—with unanimous, bipartisan support.[4] SB 846 limits the authority of Florida's public universities to "participate in any agreement," meaning any "written statement of mutual interest in academic or research collaboration," "with any foreign principal" of a foreign country of concern. Fla. Stat. § 288.860(1)(a)–(b), (3)(a)–(b). "Foreign principal[s]" include the governments of those countries of concern, their public officials, and members of their political parties. *Id.* § 288.860(1)(b). To prevent evasion, "[f]oreign principal[s]" also include businesses with their principal place of business in those countries or that are organized under those countries' laws, as well as "[a]ny person who is domiciled in" those countries and who is not "a citizen or lawful permanent resident of the United States." *Id.* § 288.860(1)(b)(3.)–(4.). Those anti-

---

[4] *CS/CS/SB 846* (2023), https://tinyurl.com/5cczun7y.

circumvention provisions track the FBI Director's warning that hostile governments operate not only through "intelligence services," but also "other actors working on their behalf," including "graduate students and researchers." Wray, *supra* note 1. The Board of Governors has explained that an "agreement . . . with any foreign principal" includes "[h]iring a foreign principal for . . . research purposes."[5]

Like the federal government, Florida's "adversary is not" the student whose "descent or heritage" lies in a foreign country of concern, but the "authoritarian government" that seeks to manipulate the student. *The China Threat*, FBI, *supra* note 1. SB 846 thus applies to covered principals regardless of their race, ethnicity, or national origin. Covered principals include "domicil[iaries]" of foreign countries of concern because those domiciliaries bear a greater risk of being coerced by their home governments. Fla. Stat. § 288.860(1)(b)(4.) As the FBI has explained, those who intend to return to their home countries (an intent that F-1 visa holders must profess, *see* 8 U.S.C. § 1101(a)(15)(F)(i)) are prone to "transnational repression tactics" such as "[s]talking," "[h]arassment," "[h]acking," and "[t]hreatening." *Transnational Repression*, FBI, https://tinyurl.com/bdhbtawy (last visited May 12, 2025).

Because the Legislature recognized the value of foreign students, SB 846 still permits public universities to enter into agreements with foreign principals. But a

---

[5] Bd. of Governors, State Univ. Sys. of Fla., *Activity with Foreign Countries of Concern Guidance Document for State University System Institutions* 1, 3 (2023) ("BOG Guidance"), https://tinyurl.com/44wrvfva.

university must first obtain "approval by the Board of Governors," which the Board may grant if the agreement is "valuable to students" and "is not detrimental to the safety or security of the United States or its residents." Fla. Stat. § 288.860(3)(d). The Board anticipates approving such agreements unless they fail to meet that minimal standard, instructing "each university board of trustees" to "request approval from the Board of Governors" by "submit[ting] a request to the Board office" with information about the "purpose and benefits of the agreement," "[a]ny identified risks of the agreement or partnership," and "[o]ther information as requested." Fla. Bd. Gov. R. 9.012(8)(c); *see* Fla. Stat. § 288.860(3)(g) (statutory grant of rulemaking authority to the Board of Governors); *see also* BOG Guidance, *supra* note 5, at 4 (process for submitting a request for approval).

The statute does not authorize the Board to penalize private individuals, even foreign principals, for failing to seek Board approval. The Board's sole enforcement mechanism is to "sanction a state university" for violations, including by "withhold[ing] additional performance funding." Fla. Stat. § 288.860(3)(d)(1.)–(2.).

### B.    The F-1 Visa Program

In 1952, Congress created the modern immigration system. Federal law currently classifies aliens into four broad categories: illegally present aliens, refugees, nonimmigrants (who hold visas), and immigrants (also called lawful permanent residents, LPRs, or green-card holders). *See* 8 U.S.C. § 1101(a)(15). Among other types of visas, Congress created a class for students called the F-1 visa. *See id.* § 1101(a)(15)(F)(i). Federal law

9

permits federal officers to issue an F-1 visa to international students for the purpose of "pursu[ing] a full course of study" at an approved "academic institution." *Id.* But that visa is temporary, as an alien must "hav[e] a residence in a foreign country which he has no intention of abandoning." *Id.*

The F-1 visa program largely relies on the cooperation and discretion of schools.

First, before an alien can even apply to a school, that school must decide whether it wishes to participate in the federal Student and Exchange Visitor Program (SEVP). To participate and thus to accept foreign students, an educational institution must receive certification. *See Certification*, U.S. Dep't of Homeland Security, https://tinyurl.com/3b8crcet (last visited May 12, 2025); 8 C.F.R. § 214.3(h). Certification requires a school to demonstrate that it is a "bona fide school" and "[p]ossesses the necessary facilities, personnel, and finances to conduct instruction in recognized courses." 8 C.F.R. § 214.3(a)(3)(i)(A), (C). Certified schools (except an English-language training program) need not even be accredited. *See id.* § 214.3(b). As part of the certification process, the school must appoint at least one principal designated school official (PDSO) and as many designated school officials (DSOs) to assist the PDSO as the school deems "necessary." 8 C.F.R. § 214.3(*l*)(1). Such officers must be LPRs or citizens of the United States. *Id.* § 214.3(*l*)(1)(i). A school's PDSO and DSOs are responsible for approving certain activities by alien students, including certain types of employment. 8 C.F.R. §§ 214.3(*l*)(1), 214.2(f)(1), (f)(6)(iii), (f)(9)(ii), (f)(10).

Once a school is certified, it may accept students. Applying to an SEVP-certified school is the first step an alien must take toward an F-1 visa. *See Applying for a Visa to Travel to the United States*, U.S. Dep't of Homeland Security, https://tinyurl.com/yc2wdhea (last visited May 12, 2025); 8 C.F.R. § 214.2(f)(1)(i). The university has total discretion whether to admit an alien. *See* 8 C.F.R. § 214.3(k). Federal regulations say nothing about admission and provide no standards governing admission of aliens to a university. *See id.* Instead, in its certification to the federal government that it has accepted an alien student, the school need only state that the alien "meet[s] all standards for admission." *Id.* § 214.3(k)(3). For that reason, consular officers are instructed "normally [to] not go behind the" school's admittance "to assess the applicant's qualifications as a student for that institution," unless there is evidence of "fraud or misrepresentation to garner acceptance into the school." 9 Foreign Affairs Manual 402.5-5(H)(1) (noting that such fraud goes to whether "the applicant has a bona fide intent to engage in study in the United States").

The visa program does not set comprehensive educational standards for aliens. *See* 8 C.F.R. § 214.2(f)(6). While the regulations state, for instance, that aliens completing undergraduate studies must attend "at least 12 semester or quarter hours of instruction per academic term," those regulations state nothing about the school's educational philosophy, standards, or methodology. *See id.* § 214.2(f)(6)(i)(B). The federal floor on credit-hours merely serves to ensure that aliens are receiving "a full course of study"; it does not prescribe what those studies must entail. *See id.* The regulations permit

11

institutions to admit, enroll, and educate aliens as the schools see fit, so long as those institutions meet the minimal requirements for certification and the admitted aliens take the minimum credit hours. *See id.* § 214.3.

After admitting a foreign student, a DSO of the school fills out a Form I-20—the next step toward an F-1 visa. *Id.* § 214.3(k). A school may issue that form only after (1) it has confirmed that the alien has "made a written application to the school"; (2) the school has reviewed the alien's application and records, including "proof of financial responsibility for the student"; (3) the school "has determined that the prospective student's qualifications meet all [of that school's] standards for admission"; and (4) the school has "accepted the prospective student." *Id.* The form must include the school's name and address; the alien's name, home country, and date of birth; information about the program to which the school has chosen to admit the alien; the financial status of the alien; and employment authorizations. *See Sample I-20 Form*, Dep't of Homeland Security, https://tinyurl.com/3835dhwr (last visited May 12, 2025); *see also* DE20-7 (Plaintiff Guo's sample I-20 form). The financial information serves to ensure that an alien "possesses sufficient funds to cover expenses while in the United States." 22 C.F.R. § 41.61(b)(1)(ii). The DSO of the school and the alien must attest to the truthfulness of the information contained in that form. 8 C.F.R. § 214.3(k).

With a Form I-20 in hand, the alien can begin applying for an F-1 visa from the State Department. To do so, the prospective student must fill out another form online—a Form DS-160. *Student Visa*, U.S. Dep't of State,

https://tinyurl.com/39easd9y (last visited May 12, 2025). Among other questions, the alien must answer "yes" or "no" to whether they "seek to engage in espionage, sabotage, export control violations, or any other illegal activity while in the United States." Bureau of Consular Affairs, U.S. Dep't of State, *Online Nonimmigrant Visa Application DS-160 EXEMPLAR* at 36, https://tinyurl.com/tt5hnhj5 (example of online application with questions). The alien will then schedule a visa interview appointment at the American embassy or consulate in their country to present their Form I-20, Form DS-160, and "documentary evidence of financial support." 8 C.F.R. § 214.2(f)(1)(i); *see also* Student Visa, *supra.*

After the interview, the consular office decides whether the alien is eligible for a visa. A visa application will be rejected if "it appears to the consular officer," based on the limited information before him—i.e., the alien's "statements in the application" and "the papers submitted therewith"—"that such alien is ineligible to receive a visa." 8 U.S.C. § 1201(g); *see id.* § 1182(a)(3)(A). Aliens are inadmissible if the Secretary of State has "reasonable ground to believe" that an alien seeks to commit "espionage or sabotage" or "any other unlawful activity," *id.* § 1182(a)(3)(A), or that admission "would have potentially serious adverse foreign policy consequences for the United States," *id.* § 1182(a)(3)(C)(i). Otherwise, the consular officer "may issue" a visa to "a nonimmigrant who has made proper application therefor." *Id.* § 1201(a)(1). The alien may then arrive up to 30 days before his or her studies begin, 8 C.F.R. § 214.2(f)(5)(i), and may remain in the country for up to 60 days after those studies end, *id.* § 214.2(f)(5)(iv). The

13

rules also allow F-1 students to stay during periods of academic vacation between terms, *id.* § 214.2(f)(5)(iii), and during gaps between distinct educational programs, *id.* § 214.2(f)(5)(ii).

Once they arrive in the United States to begin their studies, and depending on what the university decides, students with F-1 visas might begin to work on campus. Federal regulations generally authorize three types of work: on-campus employment (the only one relevant here), off-campus employment, and practical training. *See id.* § 214.2(f)(9), (10). On-campus employment is "deemed to be part of the academic program of a student otherwise taking a full course of study," *id.* § 214.2(f)(6)(i)(H), and in fact "must be an integral part of the student's educational program," *id.* § 214.2(f)(9)(i). Federal law "authorizes" on-campus employment in the sense that it shields an F-1 student (and the university that employs him or her) from federal penalties that would usually apply. *See* 8 U.S.C. §§ 1255(c)(2), (c)(8), 1227(a)(1)(C)(i), 1324a(a); 8 C.F.R. § 214.1(e).

The relevant regulatory provision—spanning a single paragraph of less than 400 words—reinforces that on-campus employment is part of the educational experience over which States have control. With one exception, it does not dictate what the university employer (here, the State) must consider in deciding whether to hire or fire an alien. 8 C.F.R. § 214.2(f)(9)(i) (on-campus employment must not "displace United States resident[]" employees). Those regulations primarily limit what a student can do in the scope of employment. On-campus employment must, for instance, be "on the

14

school's premises" (or "an off-campus location that is educationally affiliated with the school"), be limited to "20 hours a week while school is in session," and may "not begin . . . more than 30 days prior to the actual start of classes" for the student. *Id.*

### C.    Plaintiffs

Plaintiffs Yin and Guo are Chinese citizens currently enrolled as doctoral students at Florida International University (FIU). DE1 ¶¶ 10, 37–38. Each holds an F-1 visa. DE20-3; DE20-12. Each was admitted to his respective doctoral program and received from FIU an "accompanying offer of a graduate teaching assistantship" that included an annual stipend, tuition waiver, and health insurance. DE1 ¶¶ 37–38; *see* DE20-6; DE20-13. After Yin and Guo had accepted FIU's offers and relocated to Florida, the university informed them that their assistantships were "deferred until . . . fully approved" by the Board. DE20-8 (letter dated Dec. 20, 2023); DE20-15 (letter dated Jan. 9, 2024). To date, FIU has not requested the Board's approval to hire Yin and Guo as graduate assistants. *See* DE26-1 at 2.

Plaintiff Guan is a professor at the University of Florida (UF). DE1 ¶ 40. He alleges that SB 846 has "adversely affected [his] ability to recruit and hire the best candidates." DE20-1 at 2. To date, UF has not requested the Board's approval for any graduate assistants for Professor Guan. *See* DE26-1 at 2.

### D.    Procedural History

In March 2024, Plaintiffs sued the Commissioner of the Florida Department of Education and the members of the Board of Governors. DE1. They did not sue FIU

or UF. Plaintiffs contended that SB 846 was preempted by federal immigration law. *See* DE1 ¶¶ 42–64. Yin and Guo also argued that the statute violated the Equal Protection Clause and the Due Process Clause. *See* DE1 ¶¶ 65–88. Plaintiffs moved for a preliminary injunction, DE20 at 1, which was referred to a magistrate judge, DE23.

The magistrate judge recommended granting a preliminary injunction. DE43 at 42. The magistrate judge found standing for Yin and Guo but not Professor Guan. DE43 at 12–19. On the merits, the magistrate judge rejected Plaintiffs' equal-protection and due-process theories, DE43 at 32–40, but agreed with Plaintiffs' preemption claim, DE43 at 22–32. He then recommended a universal injunction barring any "enforcement of" SB 846 against students who already have "F-1 visas," DE43 at 42, no matter whether those students were parties here.

In a three-page order, the district court accepted that report and recommendation. DE53 at 3. The district court also followed the magistrate judge's recommendation of universal relief:

> A preliminary injunction is hereby entered against all Defendants pursuant to the terms set forth in the R&R (ECF No. 43). The enforcement of Fla. Stat. § 288.860(d)–(e) is hereby enjoined to the extent that it prohibits student employment at Florida's state universities and colleges already authorized by F-1 visas issued by the federal government, including the employment of Plaintiffs Zhipeng Yin and Zhen Guo.

DE53 at 3. Despite having determined that Guan did not have standing, the district court thus effectively granted Guan relief.

16

This appeal followed. DE55. Plaintiff Guan did not cross-appeal. The Board moved the district court to stay its injunction pending appeal, DE56, which it denied, DE61. The Board then moved for the same relief in this Court. Mot. for Stay Pending Appeal, ECF No. 9. That motion is currently pending.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a plaintiff must show (1) a substantial likelihood of success on the merits; (2) a substantial risk of irreparable injury absent injunctive relief; (3) an injunction would not cause substantial harm to other interested persons; and (4) the public interest favors an injunction. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Although the first two factors are "the most critical," *Nken v. Holder*, 556 U.S. 418, 434 (2009), a "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to the four requisites," *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). As a result, "[f]ailure to show any of the four factors is fatal." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

This Court reviews the district court's decision to grant or deny "a preliminary injunction for abuse of discretion," reviewing factual findings "for clear error and legal conclusions *de novo*." *Barber v. Gov. of Ala.*, 73 F.4th 1306, 1316 (11th Cir. 2023).

## SUMMARY OF ARGUMENT

Plaintiffs challenge, as unconstitutional and preempted by federal law, Florida's attempt in SB 846 to protect its institutions and research from hostile foreign

17

governments and their potential agents. Instead of recognizing that SB 846 falls comfortably within Florida's sovereign prerogative to regulate its own hiring decisions at its own educational institutions, the district court found SB 846 preempted and granted Plaintiffs' request for a preliminary injunction preventing the Board from enforcing the statute against any student at any state university. It did so despite Plaintiffs' lack of standing; despite Plaintiffs' failure to demonstrate how SB 846 is any way inconsistent with the federal F-1 visa program; and despite this Court's repeated admonitions that the circumstances in which universal relief is justified are "rare." *Georgia v. President of the U.S.*, 46 F.4th 1283, 1304 (11th Cir. 2022) (quoting *Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021)). This Court should reverse.

**I.** Plaintiffs are unlikely to succeed on the merits of their preemption claim.

**A.** The two student Plaintiffs, Yin and Guo, lack standing. Their injuries are the result of FIU's failure to file for Board approval. Had FIU applied, the Board might well have approved on-campus employment for Yin and Guo, given the minimal requirements of SB 846. But Yin and Guo have not sued FIU; they have sued only the members of the Board. The Board cannot grant Yin and Guo relief if FIU does not submit an application for approval on their behalf. The Board cannot force FIU to submit an application, nor can it relieve FIU of its obligation to enforce SB 846 if FIU does not seek Board approval. The injuries of which Yin and Guo complain—the denial of their application for on-campus employment—are therefore traceable to FIU and

not redressable by the Board. Yin and Guo have thus failed to establish two of the three prerequisites to Article III standing.

**B.** SB 846 is not preempted. Plaintiffs cannot overcome the backdrop of the presumption against preemption, which "has greatest force when Congress legislates in an area traditionally governed by the States' police powers," as here. *CTS Corp. v. Waldburger*, 573 U.S. 1, 19 (2014).

First, the district court incorrectly held that SB 846 interferes with federal regulations related to alien employment. But those regulations, which span a mere paragraph, are hardly evidence of a "clear and manifest" intent by Congress to displace all state regulation of employment of F-1 students. *Arizona v. United States*, 567 U.S. 387, 400 (2012). Even less are they a requirement that state universities hire those aliens without any type of security screening. The regulations demonstrate that educational institutions have near-total control over every aspect of the educational experience for aliens. That control naturally translates to employment, which is—as the federal regulations themselves demand—an "integral part of the student's educational program." 8 C.F.R. § 214.2(f)(9)(i).

The district court next held that the shallow security screening performed by the State Department as part of the F-1 visa process preempts SB 846. The Department's surface-level review of an alien's self-submitted questionnaire and social media postings, however, is hardly the stuff of preemption. It again does not reflect a "clear and manifest purpose" to exclude the States from running a complementary security review to

that of the State Department. *Arizona*, 567 U.S. at 400. Just like in criminal law enforcement, "in the vast majority of cases where federal and state laws overlap, allowing the States to [enforce state law] is entirely consistent with federal interests." *Kansas v. Garcia*, 589 U.S. 191, 212 (2020). If that were not the case, "[o]ur federal system would be turned upside down" by a runaway preemption doctrine. *Id.* The more natural inference from the federal security screening—the one that must be drawn given the presumption against preemption—is that Congress simply intended to provide a floor with its security review, not a ceiling. Nothing in the F-1 visa statutes or regulations indicate that Congress saw State Department desk agents as the first, last, and only line of defense against threats to the nation or to informational security.

As a last resort, the district court held that foreign-affairs interests preempt SB 846. But SB 846's impact on foreign relations is marginal and incidental at best. Incidental impact like what SB 846 might speculatively pose does not give rise to preemption absent an express congressional or executive policy with which the state law conflicts. *Clark v. Allen*, 331 U.S. 503, 517 (1947).

In crediting these thin preemption rationales, the district court ignored that Congress has expressly authorized state legislation such as SB 846. The Personal Work Opportunity Reconciliation Act of 1996 (PRWORA) provides that States may determine the eligibility of aliens for "postsecondary education" benefits like educational employment. 8 U.S.C. § 1621(c)(1)(B). "Notwithstanding any other provision of law," PRWORA says, a state law like SB 846 is permissible. 8 U.S.C. § 1622(a).

20

The district court also failed to account for the facial nature of Plaintiffs' challenge to SB 846. To prevail on such a claim, Plaintiffs must show that "no set of circumstances exists under which the [statute] would be valid." *United States v. Hansen*, 599 U.S. 762, 769 (2023). They have failed in this showing. There are several circumstances in which application of SB 846 does not even come within the ambit of the F-1 visa process, including when the Board completes its review of a foreign principal's application for on-campus employment before the state university ever admits the student and fills out a Form I-20 for the State Department on the student's behalf.

**II.** Even if injunctive relief were appropriate, it would not be so for non-parties. *See Georgia*, 46 F.4th at 1303–04. In *Georgia*, this Court rejected the proposition that an interest in the uniform application of law across an entire jurisdiction by itself would justify a universal injunction. 46 F.4th at 1307. A court issues an injunction to do one thing: "offer full relief to the plaintiffs." *Id.* at 1306. A court does not "enjoin a law," as so many in the legal profession so often forget. A court enjoins parties—the defendants charged with enforcing a law (and their "agents" and those "in active concert or participation with" them, Fed. R. Civ. P. 65(d)(2))—and it does so for the benefit of the plaintiffs who brought the suit. Injunctive relief for non-parties is justified only insofar as it is incidental to affording full relief to the named plaintiffs. Here it is beyond dispute that the student Plaintiffs would have their alleged injuries fully remedied by an injunction limited to them.

21

**III.** Plaintiffs have also failed to meet the remaining requirements for preliminary injunctive relief. Any harm done to Plaintiffs Yin and Guo is outweighed by the harm done to the State of Florida and the public interest from the "State [being] enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). The balance of the equities strongly favors the State's ability to protect its citizens through its validly enacted legislation.

## ARGUMENT

### I.    Plaintiffs have failed to show that they are likely to succeed on the merits.

#### A.    The student Plaintiffs lack standing because FIU, not the Board of Governors, is responsible for Plaintiffs' alleged injuries.

The district court found standing for the student Plaintiffs (Yin and Guo). But that ruling ignores that FIU is charged with enforcing SB 846 and is the real source of injury, because FIU never submitted an application for approval of Yin or Guo. Until it does so, FIU has an independent obligation to follow SB 846 and not employ the two students. The Board is powerless to provide any relief.

To have standing under Article III, a plaintiff must show injury in fact, traceability, and redressability. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). This task is "substantially more difficult" when plaintiffs challenge "the government's

allegedly unlawful regulation . . . of *someone else*." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992).

Yin and Guo's alleged injuries are not traceable to the Board of Governors, as their "grievance lies with absent third parties." *City of South Miami v. Gov. of Fla.*, 65 F.4th 631, 640 (11th Cir. 2023). Their alleged injuries—lost research opportunities and financial harms—stem from decisions by FIU, not the Board. *See* DE20-15 at 2 (deferring Yin's assistantship); DE20-8 at 2 (same for Guo). FIU told the student Plaintiffs that it was "defer[ring]" their assistantships because "[t]he process to obtain the necessary approvals will take several months." DE20-15 at 2; DE20-8 at 2. But FIU never followed through, and so the Board never had an opportunity to consider the assistantships at issue. *See* DE26-1 at 2. Plaintiffs do not allege otherwise. Accordingly, Plaintiffs' injuries are traceable only to "absent third parties." *City of South Miami*, 65 F.4th at 640.

It is no answer that SB 846 authorizes the Board to "sanction a state university," including by "withhold[ing] additional performance funding." Fla. Stat. § 288.860(3)(d). Sanctions are possible only if a university, "without approval of the board, enters into a partnership or an agreement" with a foreign principal. *Id.* FIU did not do so in this case; for whatever reason, it allowed Yin and Guo's applications to lie fallow and did not seek permission to grant them on-campus employment. FIU's decision not to seek the approval of the Board cannot be traced to any threatened enforcement, as seeking approval is not just allowed but encouraged by the statute.

To bypass this problem, the district court suggested that Yin and Guo's injuries were "traceable to the enactment of SB 846." DE43 at 15. But "federal courts have no authority to erase a duly enacted law from the statute books." *Jacobson*, 974 F.3d at 1255. Their power is "more limited"; they may "enjoin" specific "executive officials from taking steps to enforce a statute." *Id.* Tracing injury to a law's enactment is thus not the same as tracing it to the "conduct" of a defendant and cannot itself support standing. *California v. Texas*, 593 U.S. 659, 669–73 (2021); *see also id.* at 669 (noting that the alleged injury must be "traceable *to the defendant's allegedly unlawful conduct*" (emphasis added)). Even if FIU rescinded the students' employment offers because "of SB 846," DE43 at 15, that merely underscores that the "[t]he plaintiffs' real problem" is with FIU, not with the Board, *Support Working Animals, Inc. v. Gov. of Fla.*, 8 F.4th 1198, 1203 (11th Cir. 2021).

The district court's redressability analysis was no better. It opined that enjoining the Board from levying sanctions against a noncompliant university would undo Plaintiffs' harm. DE43 at 16. But even if the Board were enjoined from acting under SB 846, there is no evidence that FIU would then employ the student Plaintiffs. To conclude otherwise, one must assume that FIU would disobey the law (i.e., shirk its obligation to seek Board approval and then employ Plaintiffs on campus) absent the threat of sanction. Yet "[l]ocal [and state] officials have an independent obligation to follow the law" in Florida, and "the record does not establish that it is likely that officers will . . . violate the law." *City of South Miami*, 65 F.4th at 643 (citing Fla. Stat. § 112.311(6)). FIU's

24

professed desire to follow SB 846 indicates the contrary: that it will follow SB 846. *See* DE20-8; DE20-15. And FIU's nearly two-year long refusal to ever apply to the Board on the Plaintiffs' behalf only suggests that FIU may have thought better of those job offers for reasons unrelated to SB 846. *See* DE26-1 at 2. Plaintiffs have failed to sue FIU, the true source of their alleged injuries.

### B.    The F-1 visa program does not preempt SB 846.

The Supreme Court "has never held that every state enactment which in any way deals with aliens" is preempted. *DeCanas v. Bica*, 424 U.S. 351, 355 (1976), *superseded on other grounds*; *see Garcia*, 589 U.S. at 195, 212–13. Even in the immigration context, "courts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Arizona*, 567 U.S. at 400 (cleaned up). Plaintiffs challenge Florida's rules for awarding graduate assistantships and attendant benefits in the State's own public universities. SB 846 thus involves those historic state powers related to employment and education, *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (noting that "States possess broad authority under their police powers to regulate" even purely private "employment relationship[s]"); *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 779 (6th Cir. 2015) ("[H]igher education is a function within the traditional purview of state government."), as well as "trade secret protection[] and misappropriation of proprietary information," *Abbott Lab'ys v. Brennan*, 952 F.2d 1346, 1355–56 (Fed. Cir. 1991). That deference applies doubly for the State's own employment relationships, where the State has "far broader powers than [it] does [when

25

acting] as sovereign." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). And overcoming a state's sovereign authority to exercise its police power is the hardest to achieve when it would "impose *affirmative* obligations on the States," such as by requiring the state to hire individuals without security screenings. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16–17, 24 (1981).

Still, the district court found that SB 846 is likely implicitly preempted by federal law. The court found that SB 846 conflicted with (1) a supposed right of student-visa holders to be employed; (2) the shallow security screening done by the State Department when issuing an F-1 visa; and (3) federal foreign-relations interests. DE43 at 28–32. None of these theories holds water. Even if they did in some circumstances, Plaintiffs' burden on their *facial* claim requires them to show that there is "no set of circumstances" where the statute is valid. *United States v. Salerno*, 481 U.S. 739, 745 (1987). In short, if there is even one valid application of SB 846, Plaintiffs lose. *See id.*

### 1.    Federal regulations allowing student visa holders to pursue a "full course of custody" in the U.S. do not preempt SB 846.

Far from scaling the "high threshold" for conflict preemption, the approval process in SB 846 coheres entirely with the grant of a student visa. *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011) (plurality opinion). To succeed on their preemption claim, Plaintiffs must show that Congress "confer[red] a federal right to be free from" state regulation. *Murphy v. NCAA*, 584 U.S. 453, 479 (2018). The district court held that SB 846 conflicted with federal regulations that "allow admitted nonimmigrant student visa

holders to pursue a 'full course of study' in the United States," which in the district court apparently equates to *requiring* employment as part of that study. DE43 at 30 (quoting 8 U.S.C. § 1101(a)(15)(F)(i)). But the regulations cited by the district court do not establish any right to be employed by a university, let alone a state university. *See* DE43 at 25–26, 30. Rather, the regulations *authorize* student employment by shielding universities and foreign students from federal penalties that would otherwise apply if a university chose, in its discretion, to offer on-campus employment along with admission. *See* 8 U.S.C. §§ 1255(c)(2), (c)(8), 1227(a)(1)(C)(i), 1324a(a)(1); 8 C.F.R. § 214.1(e). The regulations thus enable rather than undermine hiring discretion by a university.

Florida's law operates well within that hiring discretion. The F-1 visa program effectuates the choices of universities, meaning—for public universities—choices by the State. To qualify to accept alien students at all, a university must first—solely in its discretion—"apply for and have been granted Student and Exchange Visitor Program (SEVP)-certification." *Certification*, U.S. Dep't of Homeland Security, *supra*. And then, before a foreign student may even seek an F-1 visa, he must apply for and be accepted for admission as a student at a qualifying university—also entirely within the university's discretion. *See Applying for a Visa to Travel to the United States*, U.S. Dep't of Homeland Security, *supra*; 8 C.F.R. § 214.2(f)(1)(i)(A).

The final step for a foreign student seeking university employment is to be hired. There is no sign that Congress left the States with any less discretion at this final step than in the first two. Were there any doubt, it would be resolved by the Personal

27

Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA). That law provides: "Notwithstanding any other provision of law . . . , a State is authorized to determine the eligibility for any State public benefits," 8 U.S.C. § 1622(a), including "postsecondary education" benefits, *id.* § 1621(c)(1)(B), for "nonimmigrant[s]" such as F-1 visa holders, *id.* § 1622(a); *see also Estrada v. Becker*, 917 F.3d 1298, 1308 n.12 (11th Cir. 2019) (holding that state policy excluding DACA recipients from state universities was "consistent with 8 U.S.C. § 1621(a)" because "Congress decided which aliens are eligible for state and local benefits, including postsecondary education benefits"). Thus, whatever "any other provision of law" might say about the issue, Congress authorized Florida to make its own decisions about graduate-teaching assistantships, with their attendant stipends, tuition waivers, and other benefits like health insurance.[6] *Id.* § 1622(a).

In ruling to the contrary, the district court failed to cite the presumption against preemption or the PRWORA. *See generally* DE43. And its textual analysis was unpersuasive. The district court identified no basis "in the text and structure of the [immigration] statute[s]" to conclude that Congress intended to displace state hiring authority and

---

[6] The term "state or local public benefit" excludes certain "contract[s] . . . for a nonimmigrant whose visa for entry is related to such employment in the United States." 8 U.S.C. § 1621(c)(2)(A). But the phrase "visa . . . related to such employment" most naturally refers to employment visas, which depend on a U.S. employer sponsoring the alien with an offer of employment. An F-1 visa, by contrast, is "solely for the purpose of pursuing" "a full course of study." *Id.* § 1101(a)(15)(F)(i). Any employment is "incident" to that purpose. 8 C.F.R. § 214.2(f)(9). Congress's definition of public benefits accounts for that difference by distinguishing "contract[s]" and "license[s]," *see* 8 U.S.C. § 1621(c)(2)(A), from "postsecondary education . . . benefit[s]," *see id.* § 1621(c)(1)(B).

guarantee on-campus employment to every F-1 visa-holder. *Garcia*, 589 U.S. at 208. The court was right that employment and education are intertwined for F-1 students, but wrong that the F-1 visa program guarantees employment as "part of the 'academic program.'" DE43 at 30. An F-1 visa holder has no right to a particular educational experience and no right to demand that employment be a part of that experience. Federal law instead permits States to determine the educational experience of aliens. *See* 8 C.F.R. § 214.2(f); *see also id.* § 214.3(a)(3) (laying out the minimal requirements for school certification in the F-1 program); *supra* 9–15.

The regulations related to employment only bolster state control. They confirm that "on-campus employment," the type of employment involved here, "must be an integral part of the student's educational program." 8 C.F.R. § 214.2(f)(9)(i). "On-campus employment pursuant to the terms of a scholarship, fellowship, or assistantship is deemed to be part of the academic program of a student otherwise taking a full course of study." *Id.* § 214.2(f)(6)(i), (iii). Unlike other visa applicants, an F-1 applicant must show he "possesses sufficient funds to cover expenses while in the United States or . . . that other arrangements have been made to meet those expenses." 22 C.F.R. § 41.61(b)(1)(ii). Future academic employment may factor into that equation, but "[f]oreign students are severely restricted in terms of the number of hours that they may work." *United States v. Tongo*, 16 F.3d 1223, 1994 WL 33967, at *1 n.1 (6th Cir. 1994) (per curiam) (citing 8 C.F.R. § 214.2(f)(9)). The work "must either be performed on the school's premises . . . or at an off-campus location that is educationally affiliated with

29

the school." 8 C.F.R. § 214.2(f)(9)(i).[7] And because federal law provides state universities with significant discretion to determine the educational experience for F-1 visa holders, the States also have discretion over any employment accompanying that experience. If that were not true, the employment would run afoul of Congress's command that F-1 visas issue "solely for the purpose of pursuing" "a full course of study." 8 U.S.C. § 1101(a)(15)(F)(i).

### 2. The State Department's decision to grant an F-1 visa does not preempt SB 846.

There is no more merit to the district court's theory that SB 846 "revisit[s], question[s], and potentially seek[s] to override the federal immigration determination that the pertinent student does not pose a national security concern." DE43 at 29. Nothing about SB 846's approval process seeks to question the federal government's assessment at the time it issues the F-1 visa—rather, the process addresses security of employment at the moment of hiring. And "in the vast majority of cases where federal and state laws overlap, allowing the States to [enforce their laws] is entirely consistent with federal interests." *Garcia*, 589 U.S. at 212.

---

[7] "Off-campus" employment is permissible on a case-by-case basis for a "student [who] has been in F-1 status for one full academic year" and who faces "severe economic hardship caused by unforeseen circumstances beyond the student's control." 8 C.F.R. § 214.2(f)(9)(ii)(C), (D)(1). Another type of employment "directly related to their major area of study," known as "practical training," is available to F-1 students on a case-by-case basis after "one full academic year" in the program. 8 C.F.R. § 214.2(f)(10).

The lower court believed that the federal security screening conducted during the visa-application process is "exclusive." DE43 at 29–30. The contention that the federal review is a one-and-done scenario has no basis in the federal statutes at issue, let alone the "clear and manifest purpose of Congress." *Arizona*, 567 U.S. at 400. The district court simply concluded from the existence of cursory State Department review that Congress must have meant for that review to resolve all security issues for all time. *See* DE43 at 29. That analysis is nothing more than an appeal to "brooding federal interest[s]" disconnected from "the text and structure of the statute," which here give no indication of exclusivity. *Garcia*, 589 U.S. at 202, 208.

It is also unreasonable to infer that Congress created a ceiling of security with its limited security review. Plaintiffs offered no basis beyond ipse dixit for the argument that Congress expected the F-1 visa clearance process to identify every security threat. The only reasonable inference is that Congress created a floor, allowing States to assist federal authorities in identifying risks and in protecting their own state interests. After all, the State Department rejects a visa application only if "it appears to the consular officer," based on the limited information before him, "that such alien is ineligible to receive a visa." 8 U.S.C. § 1201(g); *see id.* § 1182(a)(3)(A). That information includes only the alien's "statements in the application" and "the papers submitted therewith"; the consular officer's review is hardly searching or comprehensive. *Id.* § 1201(g). And while a visa may later be revoked, *id.* § 1201(i), nothing in that grant of authority suggests Congress was "clear[ly] and manifest[ly]" under the unrealistic impression that federal

31

officials would be the nation's only line of defense against every possible threat. *Arizona*, 567 U.S. at 400. If anything, the power to revoke a visa suggests the opposite—that Congress understood that security risks can fluctuate.

The assumption that the F-1 visa program built a ceiling of security is even more unrealistic when it comes to graduate assistantships. "On-campus employment" is "incident to status" and may begin at any time. 8 C.F.R. § 214.2(f)(9)(i). Unlike off-campus employment or practical training, on-campus employment does not require authorization by or notification to the federal government. *Compare id.*, *with id.* § 214.2(f)(9)(ii)(A) (F-1 student must be "authorized to work off-campus"), *and id.* § 214.2(f)(10) ("[p]ractical training may be authorized to an F-1 student" under certain conditions). A university thus could offer on-campus employment long after the student receives the F-1 visa, without the federal government even being aware.

The original Form I-20 might mention the possibility of the student's on-campus employment,[8] but it is not required to do so. A failure to mention the possibility does not preclude a school from later employing the student.[9] This explains, for example,

---

[8] *See Employment*, U.S. Immig. and Customs Enforcement, https://tinyurl.com/ycxherpf (last visited May 12, 2025) (stating that an I-20 may reflect on-campus employment if the student "intends to list on-campus employment as a means of financial support," but if a student does not, a DSO "may" still choose to indicate on-campus employment in the remarks section of the SEVIS system); *USCIS Policy Manual*, U.S. Citizenship and Immig. Servs., *Chapter 6—Employment*, https://tinyurl.com/jjs8a6sp (last updated Feb. 26, 2024).

[9] *Employment*, U.S. Immig. and Customs Enforcement, *supra* note 8.

why the space for employment authorizations on Plaintiff Guo's Form I-20 is blank.[10] DE20-7. And because "F-1 students engaged in on-campus employment are not required to apply for employment authorization with USCIS," *USCIS Policy Manual*, U.S. Citizenship and Immigr. Servs., *Chapter 6—Employment*, *supra* note 8, the federal regime does not even contemplate that immigration officials will know of that employment, much less that those officials will comprehensively identify and mitigate the risks associated with it.

The most natural inference for on-campus employment is that Congress allowed States to supplement the federal government's national-security review. Given the presumption against preemption, that is the inference that must be drawn. But even if the Court disagrees, the PRWORA still permits SB 846 "notwithstanding" the security review process.

### 3.    Federal foreign-affairs interests also do not preempt SB 846.

The district court speculated next that SB 846 "has more than [] some incidental or indirect effect in foreign countries," thus implicating "the federal government's Foreign Affairs Power." DE43 at 23, 31 (quotation marks omitted). But the oft-questioned

---

[10] The purpose of the financial section, rather than to detect security threats, is merely to ensure that the alien "possesses sufficient funds to cover expenses while in the United States or . . . that other arrangements have been made to meet those expenses." 22 C.F.R. § 41.61(b)(1)(ii). So the most information the federal government might receive about on-campus employment is how much a student expects to earn. *See* DE20-7 (Guo's Form I-20); DE20-14 (Yin's Form I-20); *see also* Sample I-20 Form, *supra*.

ruling in *Zschernig v. Miller* remains the only time the Supreme Court has deemed an incidental or indirect effect on foreign affairs, with no express federal policy, sufficient to preempt state law. 389 U.S. 429 (1968). By its terms, that case is limited to statutes requiring state officers to launch "minute inquiries concerning the actual administration of foreign law." *Id.* at 435; *see also Shames v. Nebraska*, 323 F. Supp. 1321, 1326–32 (D. Neb. 1971) (three-judge district court), *aff'd*, 408 U.S. 901 (1972) (alien land law without reciprocity provision did not intrude upon foreign affairs because *Zschernig* was limited to "judicial criticism of foreign governments"); *Trojan Techs., Inc. v. Pennsylvania*, 916 F.2d 903, 913 (3d Cir. 1990) (similar). Nothing of the sort happens during the Board's review under SB 846.

SB 846 furthermore conflicts with no express foreign policy. In *American Insurance Association v. Garamendi*, the Supreme Court deemed a state law preempted because it conflicted with policy expressed in executive agreements. 539 U.S. 396, 421–24 (2003). As already discussed, *see supra* 26–30, the relevant federal policy here expects and encourages state participation. It is true that the visa process screens for aliens whose admission "would have potentially serious adverse foreign policy consequences." 8 U.S.C. § 1182(a)(3)(C)(i). But SB 846 does not invite the Board to engage in any second-guessing of that foreign policy assessment. SB 846 is not a "foreign policy" statute. *See Shen v. Simpson*, 687 F. Supp. 3d 1219, 1249 (N.D. Fla. 2023) (addressing similar statute). As Plaintiffs acknowledge, it is a "security" statute, *see, e.g.*, DE1 ¶¶ 4, 6, 63–64, and Plaintiffs fail to explain how the particularized security screening performed by the

34

Board in approving a student application would interfere with any federal foreign policy. A visa grant signifies only that the Secretary of State had no "reasonable ground to believe" the alien posed sufficiently "serious" foreign policy risks to warrant denial of admission. 8 U.S.C. § 1182(a)(3)(C)(i). It would be quite a leap to infer that unspoken foreign-affairs concerns *required* States to employ the alien after admission.

In sum, SB 846's effect on aliens is insufficient for preemption. In *Clark v. Allen*, for instance, the Supreme Court upheld a state law that barred aliens from inheriting property unless their home country had reciprocal rights to inheritance for American citizens. 331 U.S. 503, 506–07 & n.1, 517 (1947). "Rights of succession to property are determined by local law," *id.* at 517, just as is true of employment and education, *Metro. Life Ins. Co.*, 471 U.S. at 756 (employment); *Kreipke*, 807 F.3d at 779 (education). Without an express "federal policy," state laws with an "incidental or indirect effect" on foreign affairs are not preempted. *Clark*, 331 U.S. at 517. And though the state law upheld in *Clark* applied evenhandedly to all aliens from countries whose laws did not qualify for reciprocity, that reciprocity made the state law even more intrusive into foreign affairs. *See Shames*, 323 F. Supp. at 1326–27. SB 846 thus has no more than an incidental effect on foreign affairs.[11]

---

[11] The PRWORA would answer this too, if need be. That is, even if SB 846 had more than an incidental effect, Congress clearly authorized this type of law determining the availability of state educational benefits under the PRWORA. *Supra* 27–28.

### 4.    Plaintiffs cannot meet the heavy burden to demonstrate facial invalidity of SB 846.

At minimum, Plaintiffs' preemption claims fail because they bring a facial challenge, and they cannot establish that "no set of circumstances exists under which the [statute] would be valid." *United States v. Hansen*, 599 U.S. 762, 769 (2023); *see* DE1 ¶¶ 82, 87 (bringing facial and as-applied challenges only as to their failed vagueness claim). The district court tried to avoid this problem by unilaterally refashioning Plaintiffs' facial preemption challenge as a narrower quasi-facial one in which they challenged the application of SB 846 to a subset of affected parties: foreign students who already hold F-1 visas. DE43 at 42; *see McGuire v. Marshall*, 50 F.4th 986, 1003 (11th Cir. 2022) ("In a 'quasi-facial' challenge, the plaintiff contends that the law cannot be constitutionally applied to a defined subset of people the law covers, which includes herself."). This refashioning was beyond the district court's authority to make and in all events ineffective to sustain Plaintiffs' preemption claim.

"Plaintiffs are the masters of their claims," and the district court was not free to "simply ignore" their choices. *Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC*, 714 F.3d 1234, 1237 (11th Cir. 2013). In effect, the court allowed Plaintiffs to style their complaint as a class action without actually certifying a class.

Plaintiffs could not have made out their original facial preemption claims. As the Supreme Court explained in *Murphy v. NCAA*, preemption flows from legal rights or duties created by federal law. 584 U.S. at 477. Only at the time the State Department

issues the visa would federal law even arguably "confer a federal right to be free from" state regulation. *Id.* at 479. Plaintiffs' theory of preemption rests on the notion that the federal security determination during the F-1 visa process is "exclusive" and the visa creates a "right to work" because it removes federal penalties for working in certain jobs. DE20 at 19–25. Those "rights," fanciful though they may be, are premised on the grant of a visa and cannot exist before the State Department approves an alien's nonimmigrant status. *See* 8 U.S.C. §§ 1182(a)(3)(A), (a)(3)(C)(i) (reasons for ineligibility), 1201(g) (visa will not issue if alien is ineligible); 8 C.F.R. § 214.2(f)(9)(i) (removing federal penalties for certain employment when alien has an F-1 visa). SB 846 contemplates that the Board's review will ordinarily be finished before the student is offered admission and thus before the federal government issues an F-1 visa, the earliest time at which any federal interest in the student's employment could attach. *Cf. Bass River Assocs. v. Mayor*, 743 F.2d 159, 163 (3d Cir. 1984) ("[I]t is illogical to conclude that Congress intended to preempt local regulation merely by making a federal license available."); *Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265, 281–83 (1977) (the "granting [of] the [federal] license" is what creates the "right to engage in" certain activity free from state regulation). Federal law cannot preempt state law before rights under federal law come into existence.

In all events, Plaintiffs cannot succeed on a quasi-facial challenge to SB 846 as applied to F-1 visa holders. *See* DE43 at 42 (recharacterizing claim as quasi-facial). "To prevail in a quasi-facial challenge, [a plaintiff] must satisfy the standard for a facial

37

challenge to the extent that his claim 'reach[es] beyond [his] particular circumstances.'" *McGuire*, 50 F.4th at 1003–04. Plaintiffs cannot. In issuing an F-1 visa, the State Department may be unaware of employment, such as where employment is not indicated on the alien's Form I-20, so the grant of a visa should not be seen as an irrebuttable determination that such employment never poses risks. DE36 at 9 (Board's supplemental briefing). Even more, if the Board then *approves* employment, there can be no conflict with federal determinations in the visa process.

## II.    The universal injunction exceeds the equitable powers of the district court.

Even if the Court disagrees on the merits, the district court still erred in creating a universal injunction to benefit non-parties. The equitable authority of the federal courts is "bounded by both historical practice and traditional remedial principles," one of which is that the "scope of injunctive relief" reaches only to the "extent necessary to protect the interests of the parties." *Georgia v. President of the U.S.*, 46 F.4th 1283, 1303 (11th Cir. 2022); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Equity did recognize an exception that "permit[ted] a portion of the parties in interest to represent the entire body." *Supreme Tribe of Ben Hur v. Cauble*, 255 U.S. 356, 363 (1921) (quoting *Smith v. Swormstedt*, 57 U.S. (16 How.) 288, 303 (1853)). This

38

device—variously termed the "representative suit" or "bill of peace"—was the precursor of the modern class action under Federal Rule of Civil Procedure 23. *See* Joseph Story, *Commentaries on Equity Pleadings* §§ 77–135, at 101–78 (4th ed. 1848); Frederic Calvert, *A Treatise upon the Law Respecting Parties to Suits in Equity* 30–34 (2d ed. 1847); *Hansberry v. Lee*, 311 U.S. 32, 41 (1940) ("The class suit was an invention of equity[.]"). But Yin and Guo did not bring a class action, nor did the district court certify one. Because Rule 23 has replaced the representative suit in modern equity jurisprudence, Yin and Guo cannot invoke these older exceptions to end-run the requirements of Rule 23. *See Georgia*, 46 F.4th at 1306 ("Several procedural devices allow [those] with similar interests to seek the protection of injunctive relief—class certification under Rule 23, joinder and intervention in an existing lawsuit, or even filing a new lawsuit of their own. A district court cannot circumvent these mechanisms in the name of providing injunctive relief only for nonparties' benefit." (citation omitted)); *Rodgers v. Bryant*, 942 F.3d 451, 464 (8th Cir. 2019) (Stras, J., concurring in part and dissenting in part).

The traditional equitable remedy most analogous to what the student Plaintiffs seek here—the injunction to stay proceedings at law—was "directed only to the parties." 2 Joseph Story, *Commentaries on Equity Jurisprudence as Administered in England and America* § 875, at 166 (2d ed. 1839). In *Scott v. Donald*, for example, the respondent had sued certain constables of South Carolina, arguing that they had confiscated his alcohol under a statute that was unconstitutional. 165 U.S. 58, 66, 78–86 (1897). The Supreme Court agreed that the statute was unconstitutional. *Id.* at 99–101. But in a separate

39

opinion, it reversed the award of an injunction protecting everyone else subject to the statute. *See Scott v. Donald*, 165 U.S. 107, 115–17 (1897). As the Court explained, "[t]he theory of the decree is that the plaintiff is one of a class of persons whose rights are infringed and threatened, and that he so represents such class that he may pray an injunction on behalf of all persons that constitute it." *Id.* at 115. "It is, indeed, possible that there may be others in like case with the plaintiff, and that such persons may be numerous[.]" *Id.* "[B]ut such a state of facts is too conjectural to furnish a safe basis upon which a court of equity ought to grant an injunction." *Id.*

Given that storied history of limiting relief to the parties, this Court frowns on universal relief. It is "both weary and wary" of the "drastic form of relief" that characterizes "universal" injunctions applicable "to plaintiffs and nonplaintiffs alike." *Georgia*, 46 F.4th at 1303. And it has counseled repeatedly that the circumstances justifying a universal injunction are "rare." *Id.* at 1304 (quoting *Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021)).

No such circumstance presents itself here. *See id.* at 1306. Analysis of whether the "rare" circumstances justifying a universal injunction exist "typically circles back to the core question: whether a [universal] injunction is necessary to offer full relief to the plaintiffs." *Id.* Yin and Guo have not even attempted to make that showing here. Nor could they. An injunction in their favor would redress their asserted injuries—their inability to get employment for *themselves* at *their* schools. Barring the Board from using its powers under the statute against anyone with an F-1 visa, DE53 at 3, provides no extra

40

relief for Guo or Yin. An injunction to protect nonparties is thus "more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano*, 442 U.S. at 702.

In ignoring this Court's caution signs about universal relief, the district court relied on a stay-panel opinion. DE61 at 2 (citing *Florida*, 19 F.4th 1271). That opinion hypothesized that universal relief "may be justified where the plaintiffs are dispersed throughout the United States, when immigration law is implicated, or when certain types of unconstitutionality are found." *Florida*, 19 F.4th at 1282. It nonetheless reaffirmed that universal injunctions should be "rare." *Id.* And its aside about immigration law hardly counts as precedent for the proposition that every immigration-related case warrants universal relief, given that a stay-panel opinion "cannot spawn binding legal consequences regarding the merits of the case." *Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790, 795 & n.2 (11th Cir. 2020); *see also Drummond Co. v. Conrad & Scherer LLP*, 885 F.3d 1324, 1328 n.1 (11th Cir. 2018). *Florida* surmised (rather than held) that "universal relief may be justified" in cases implicating immigration law, 19 F.4th at 1282, in a case that "ha[d] nothing to do with immigration," *id.* at 1283.[12] And while *Florida* stated that immigration law might be special because of "the

---

[12] The two out-of-circuit cases relied on by *Florida* are also inapposite because both interpreted the federal government's authority under the INA and were not determining whether state employment laws were preempted. 19 F.4th at 1282 (citing *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015); *Int'l Refugee Assistance Project v. Trump*,

41

need for uniformity in the enforcement of immigration law," *id.* at 1282, this Court has since rejected any suggestion that universal relief may be justified by "the general interest of national uniformity," *Georgia*, 46 F.4th at 1307. Instead, "any remedial benefit extended" to nonparties must typically be "collateral" to the relief granted to the parties themselves. *Id.* at 1304.

The district court pointed to other circuit cases to support its conclusion, DE61 at 2, but not one of those opinions addressed a scope-of-relief issue. The cases the district court cited merely held that a law was unconstitutional and purported to enjoin that law in its entirety, without pausing to consider the equitable constraints on a court's power to grant injunctive relief. *See Honeyfund.com, Inc. v. Governor*, 94 F.4th 1272, 1283 (11th Cir. 2024); *Scott v. Roberts*, 612 F.3d 1279, 1298 (11th Cir. 2010); *Statewide Detective Agency v. Miller*, 115 F.3d 904, 905–06 (11th Cir. 1997); *Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1276–77 (11th Cir. 2019) (Pryor, J., concurring). It is black letter law that decisions are not precedential on the points they do not address. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("[D]rive-by" rulings have "no precedential effect."). And one of those opinions is merely a concurring opinion in the stay-motion posture that did not tangentially address immigrants, so it is un-precedential three times over. *Ga. Muslim Voter Project*, 918 F.3d at 1276–77 (Pryor, J., concurring);

---

857 F.3d 554, 605 (4th Cir. 2017), *vacated and remanded on other grounds sub nom. Trump v. Int'l Refugee Assistance*, 583 U.S. 912 (2017).

42

*see also Democratic Exec. Comm. of Fla.*, 950 F.3d at 795 (stay opinions are non-precedential). These cases certainly do not stand for the proposition that this Court has approved of "statewide injunctions against enforcement of a state law" merely because it might regulate aliens. DE61 at 2.

### III. The balance of the equities and the public interest do not support a preliminary injunction.

The remaining equitable factors also show that a preliminary injunction is improper. None of Plaintiffs' alleged harms outweighs the harm that the State and its citizens will suffer from an injunction. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). This injury is magnified greatly by an injunction like the one in this case, which prevents enforcement of a law by the Board against any students anywhere in the State. Yin and Guo would suffer comparatively little harm from a denial of the preliminary injunction and would suffer no harm at all if the preliminary injunction is tailored to protect them only.

For that same reason, an injunction is not in the public interest. *See Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020) ("balance-of-the-harms and public-interest factors . . . 'merge' when, as here, 'the Government is the opposing party'"). A universal injunction is even worse for the system of justice. Demanding that nonparties avail

themselves of their own litigation tools "encourages multiple judges . . . to weigh in only after careful deliberation," whereas "universal injunctions tend to force judges into making rushed, high-stakes, low-information decisions." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). A universal injunction "gives a single district court an outsized role in the federal system" and frustrates a "federal court system" that "[b]y design . . . allows courts to reach multiple answers to the same legal question." *Georgia*, 46 F.4th at 1304.

## CONCLUSION

The Court should vacate the district court's injunction. At minimum, it should narrow that injunction insofar as it applies to non-parties.

Dated: May 12, 2025

Respectfully submitted,

JAMES UTHMEIER
  *Attorney General of Florida*

/s/ *Robert S. Schenck*
JEFFREY PAUL DESOUSA (FBN 110951)
  *Acting Solicitor General*
NATHAN A. FORRESTER (FBN 1045107)
DAVID M. COSTELLO (FBN 1004952)
  *Chief Deputy Solicitors General*
ROBERT S. SCHENCK (FBN 1044532)
CHRISTINE PRATT (FBN 100351)
  *Assistant Solicitors General*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, FL 32399
(850) 414-3300
*jeffrey.desousa@myfloridalegal.com*
*nathan.forrester@myfloridalegal.com*
*david.costello@myfloridalegal.com*
*robert.schenck@myfloridalegal.com*
*christine.pratt@myfloridalegal.com*

*Counsel for Defendants-Appellants*

45

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 11,306 words.

2.      This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

/s/ *Robert S. Schenck*
Assistant Solicitor General

## CERTIFICATE OF SERVICE

I certify that on May 12, 2025, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

/s/ *Robert S. Schenck*
Assistant Solicitor General

47