No. 25-11027

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

_____

ZHIPENG YIN, ET AL.
*Plaintiffs-Appellees,*

v.

COMMISSIONER,
FLORIDA DEPARTMENT OF EDUCATION, ET AL.,
*Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the Southern District of Florida No. 1:24-cv-21129-JEM-EIS

_____

**BRIEF OF PLAINTIFFS-APPELLEES**

_____

Justin Sadowsky
CHINESE AMERICAN LEGAL
DEFENSE ALLIANCE
4250 N. Fairfax Drive #600
Arlington, VA  22203
(646) 785-9154
justins@caldausa.org

Daniel Tilley
ACLU FOUNDATION OF FLA.
4343 West Flagler St., #400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Plaintiffs-Appellees certify to the best of their knowledge that—in addition to the individuals and entities listed in Defendants-Appellants' motion, App. ECF No. 9—the following additional individuals and entities may have an interest in the outcome of this case or appeal:

1. American Civil Liberties Union Foundation of Florida, Inc., *Counsel for Plaintiffs-Appellees*

2. Chinese American Legal Defense Alliance, *Counsel for Plaintiffs-Appellees*

3. Deheng Law Offices PC, *Counsel for Plaintiffs-Appellees*

4. Florida Department of Education, *Defendant-Appellant*

5. Perkins Coie, LLP, *Counsel for Plaintiffs-Appellees*

6. Sadowsky, Justin, *Counsel for Plaintiffs-Appellees*

7. State University System of Florida Board of Governors, *Defendant-Appellant*

Plaintiffs-Appellees further state that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

C-1 of 1

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................... 1

QUESTIONS PRESENTED ................................................................ 4

FACTUAL BACKGROUND ................................................................ 5

I.    SB 846 presumes that all Chinese domiciliaries are spies. .................. 5

II.   The Students are legal F-1 visa holders. .............................................. 7

      **A.  Zhipeng Yin's job offer is rescinded because of SB 846.** .... 8

      B.  Zhen Guo's job offer is rescinded because of SB 846. ................... 9

III. The Students obtain a preliminary injunction against the Board. ... 11

SUMMARY OF ARGUMENT .................................................................. 12

ARGUMENT ....................................................................................... 14

I.    The Students sued the right government officials. ............................ 14

      A.  The Students' injuries were due to the Board's enforcement
          authority under SB 846 ............................................................. 14

      B.  Only enjoining the Board from enforcing SB 846 would properly
          redress the Students' injuries. ................................................. 16

      C.  SB 846 made the Board the proper defendant to be sued. ......... 18

      D.  The Board's fingerpointing at FIU does not avoid standing. ...... 21

II.   SB 846 is preempted by the Government's F-1 Visa Program ........... 24

      A.  The F-1 visa program comprehensively regulates student
          employment ............................................................................. 25

      B.  SB 846 contradicts federal student work authorization ........... 27

C.  SB 846 also interferes with federal foreign affairs.....................30

D.  SB 846 is a regulation of employment, not a discretionary choice of whom to employ..................................................................32

E.  The Board cannot avoid preemption by claiming a role as a mere market participant ................................................................33

F.  *Estrada* does not permit denying F-1 visa holders rights granted by the federal government .......................................................34

G.  PRWORA does not give the Board the right to deny work authorization to the Students .................................................36

   1.  PRWORA does not apply to employment permitted by an F-1 visa work authorization.............................................................36

   2.  PRWORA does not allow Florida to make new F-1 classifications of favored and unfavored F-1 visa holders.....38

H.  There is no "no set of circumstances" test for preemption .........39

III. SB 846 violates the Equal Protection Clause,....................................40

A.  SB 846 discriminates on the basis of race and nationality........41

B.  SB 846 is subject to strict scrutiny because it facially discriminates against nonimmigrant alienage status...............45

C.  SB 846 fails any level of scrutiny.............................................49

IV. The case should be remanded for the discrete purpose of determining the proper scope of the injunction following *CASA*.......51

V.  The remaining injunction factors favor an injunction. .......................52

CONCLUSION ....................................................................................52

STATEMENT REGARDING ORAL ARGUMENT ..............................53

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS.................................................................54

# TABLE OF AUTHORITIES

**Cases**

*ABC Charters, Inc. v. Bronson,*
  591 F. Supp. 2d 1272 (S.D. Fla. 2008) .......................................................29

*Application of Griffiths,*
  413 U.S. 717 (1972) ..................................................................................46

*Arizona Dream Act Coal. v. Brewer,*
  855 F.3d 957 (9th Cir. 2017) ............................................................... 38, 39

*Arizona v. United States,*
  567 U.S. 387 (2012). ........................................................................ 24, 25, 29

*Babb v. Sec'y, Dep't of Veterans Affs.,*
  992 F.3d 1193, (11th Cir. 2021)................................................................52

*Bernal v. Fainter,*
  467 U.S. 216 (1984) ........................................................................ 41, 46, 50

*Bush v. Vera,*
  517 U.S. 952 (1996) ..................................................................................43

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) ........................................................................... 41, 46

*City of S. Miami v. Gov. of Fla.,*
  65 F.4th 631 (11th Cir. 2023)........................................................ 16, 18, 23

*Club Madonna Inc. v. City of Miami Beach,*
  42 F.4th 1231 (11th Cir. 2022) ........................................................... 39, 40

*Cooper v. Aaron,*
  358 U.S. 1 (1958)............................................................................... 18, 38

*Dandamudi v. Tisch,*
  686 F.3d 66 (2d Cir. 2012) ................................................................ 46, 47

*Davis v. Guam,*
  932 F.3d 822 (9th Cir. 2019) ....................................................................44

*Duke Power Co. v. Carolina Env't Study Grp., Inc.*,
  438 U.S. 59 (1978)...................................................................17

*Epic Sys. Corp. v. Lewis*,
  584 U.S. 497 (2018) ...............................................................37

*Estrada v. Becker*,
  917 F.3d 1298 (11th Cir. 2019)......................................... passim

*Fac. Senate of Fla. Int'l Univ. v. Winn,* 616 F.3d 1206 (11th Cir. 2010) 31

*Foley v. Connelie*,
  435 U.S. 291 (1978) ...............................................................35

*Graham v. Richardson*,
  403 U.S. 365 (1971) ................................................ 35, 41, 43, 46

*Haves v. City of Miami*,
  52 F.3d 918 (11th Cir. 1995) .................................................49

*Holt v. Hobbs*,
  574 U.S. 352 (2015) ...............................................................50

*Jacobson v. Florida*,
  974 F.3d 1236 (11th Cir. 2020).............................................14

*Johnson v. California*,
  543 U.S. 499 (2005) ...............................................................43

*League of United Latin Am. Citizens v. Bredesen*,
  500 F.3d 523 (6th Cir. 2007) .................................................47

*LeClerc v. Webb*,
  419 F.3d 405 (5th Cir. 2005) .................................................47

*Lewis v. Governor of Alabama*,
  944 F.3d 1287 (11th Cir. 2019)..............................................17

*Lozano v. City of Hazleton*,
  724 F.3d 297 (3d Cir. 2013) ..................................................40

iv

*Lujan v. Defs. of Wildlife,*
  504 U.S. 55 (1992)................................................................ 21, 22

*Maine Forest Prods. Council v. Cormier*, 51 F.4th 1 (1st Cir. 2022) 27, 29,
  30

*Maynard v. USF,*
  342 F.3d 128 (11th Cir. 2003). .................................................20

*McWright v. Alexander,*
  982 F.2d 222 (7th Cir. 1992) ...................................................42

*New Vision Photography Program, Inc. v. D.C.,*
  54 F. Supp. 3d 12 (D.D.C. 2014).............................................37

*Nyquist v. Mauclet,*
  432 U.S. 1 (1977)................................................................ 35, 50

*Odebrecht Const., Inc. v. Prasad,*
  876 F. Supp. 2d 1305 (S.D. Fla. 2012) .....................................29

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.,*
  715 F.3d 1268 (11th Cir. 2013).................................... 29, 31, 33, 34

*Pac. Shores Props., LLC v. City of Newport Beach,*
  730 F.3d 1142 (9th Cir. 2013) ............................................. 42, 43

*PLIVA, Inc. v. Mensing,*
  564 U.S. 604 (2011) ................................................................36

*Rice v. Cayetano,*
  528 U.S. 495, 514 (2000) .................................................... 42, 44

*Rodriguez ex rel. Rodriguez v. United States,*
  169 F.3d 1342 (11th Cir. 1999)................................................47

*Rumsfeld v. F. for Acad. & Institutional Rts.,*
  547 U.S. 47, 52 n.2 (2006).......................................................14

*Sugarman v. Dougall,*
  413 U.S. 634 (1973) .................................................................46

*Support Working Animals, Inc. v. Governor of Fla.*,
  8 F.4th 1198 (11th Cir. 2021)......................................................... 14, 21

*Szymakowski v. Utah High Sch. Activities Ass'n, Inc.*,
  756 F. Supp. 3d 1238 (D. Utah 2024).........................................48

*Takahashi v. Fish & Game Comm'n*,
  334 U.S. 410 (1948) ...................................................................41

*TikTok Inc. v. Garland*,
  145 S. Ct. 57 (2025). ..................................................................22

*Toll Bros., Inc. v. Twp. of Readington*,
  555 F.3d 131 (3d Cir. 2009) .......................................................14

Toll v. Moreno,
  458 U.S. 1, 17 (1982) ..................................................................35

*Truax v. Raich*,
  239 U.S. 33 (1915).......................................................................41

*Trump v. CASA*,
  --- S. Ct. ----. 2025 WL 1773631 (Jun. 27, 2025) .......................51

*United States v. Osorto*,
  995 F.3d 801 (11th Cir. 2021) ....................................................46

*Van Staden v. St. Martin*,
  664 F.3d 56 (5th Cir. 2011).........................................................47

*Waldman v. Conway*,
  871 F.3d 1283 (11th Cir. 2017)...................................................40

*Walters v. Fast AC, LLC*,
  60 F.4th 642 (11th Cir. 2023)......................................................15

*Williams v. Pryor*,
  240 F.3d 944 (11th Cir. 2001) .....................................................41

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ............................................................... 41, 42

vi

*Zschernig v. Miller,*
  389 U.S. 429 (1968) ................................................................ 30, 31

**Statutes**

8 U.S.C. § 1101 ................................................................. 8, 26, 47

8 U.S.C. § 1182(a) ......................................................................28

8 U.S.C. § 1184(a)(1) .................................................................26

Fla. Stat. § 1008.32 .....................................................................7

Fla. Stat. § 1008.322 ...............................................................7, 16

Fla. Stat. § 288.860 ............................................................. passim

Fla. Stat. § 908 ........................................................................23

S.B. 17, 89 Leg., Reg. Sess. (Tex 2025) .......................................44

**Other Authorities**

*Governor Ron DeSantis Cracks Down on Communist China,*
  46th Governor of Florida (May 8, 2023) ...................................1

## INTRODUCTION

International students coming to the United States on an F-1 visa go through a detailed program for approval. This includes a security screen, an interview, and detailed record keeping of student records. The F-1 visa comes with a limited ability to work while studying. That program, too, is highly regulated as to when, where, and how much a student may work, and again requires documentation.

Florida has taken upon itself to second-guess the security determinations of the federal government. While Chinese F-1 students have already passed a rigorous screen by the federal government, Florida nevertheless finds these students a danger to our country. They may study at Florida schools. They may take History, Economics, Chemistry, and Physics. They may have access to school laboratories. But for them to hold a job at a public university is a step too far. Unless that Chinese F-1 student gets special approval from the Board of Governors or the Board of Education, even a basic teaching assistant job poses a threat to our nation's security.

Florida's actions are preempted by the federal immigration scheme. The Board of Governors barely deigns to argue otherwise. Its only real

argument on the merits is that the government, as an employer, can make its own decisions who to hire or not hire. But in passing SB 846, Florida was not acting like an employer. Indeed, SB 846 takes the power to hire Chinese F-1 decisions out of the employing University's hands and places it in the hands of the Board of Governors (or State Board of Education).

Florida's targeting of Chinese F-1 visa holders for separate treatment also violates the Equal Protection Clause. Whether deemed discrimination on the basis of race or on the basis of immigration status, strict scrutiny applies. And even if something less than strict scrutiny applied, Florida's only rationale for SB 846—national security—is not a legitimate ground in light of the preemptive effect of federal immigration law.

Without much to argue on the merits, the Board of Governors mostly makes procedural arguments.

The Board claims that SB 846 sufficiently diffused enforcement responsibility among enough actors that really nobody is responsible for enforcement. The Board suggests that maybe the Students here should have sued university officials instead, even though SB 846 specifically

2

placed enforcement authority in its hands, and even though the university officials that the Students should have sued do not have the authority to hire them without Board approval.

The Board separately argues that the District Court should not have issued a nationwide injunction. But the law is invalid on its face. Preempted laws are, at least for now, still enjoined outright. And the immigration context in particular counsels for a statewide injunction, rather than requiring every single Chinese F-1 visa holder to separate sue (and suffer harm in the meantime) to overcome an unconstitutional law.

## QUESTIONS PRESENTED

1.    Can the entity entrusted by the State with the discretionary authority to enforce an unconstitutional law be sued to enjoin that enforcement?

2.    Is a state law that second guesses, in the name of national security, the federal government's decision to permit an F-1 visa holder to hold employment preempted by federal immigration law?

3.    Does a state law that targets Chinese F-1 visa holders as specially dangerous and disloyal, and deny them the equal right to employment in the State of Florida, solely on the basis of national security interests that are the province of the federal government, violate the Equal Protection Clause?

4.    May a District Court enjoin the statewide application of a law that is facially invalid and preempted by federal immigration law?

4

## FACTUAL BACKGROUND

### I.     SB 846 presumes that all Chinese domiciliaries are spies.

In 2023, Florida adopted three new laws "to counteract the malign influence of the Chinese Communist Party [('CCP')]" in Florida.[1] One of these laws, SB 846, was meant to "combat . . . higher education subterfuge carried out by the CCP and its agents" and "root out Chinese influence in Florida's education system." *Id*. According to Florida, SB 846 provides state leadership "in protecting American interests from foreign threats" as well as in "provid[ing] a blueprint for other states to do the same." *Id*.

SB 846 is codified at Fla. Stat. § 288.860. SB 846 designates as a "[f]oreign principal" any international student or professor from seven "[f]oreign countr[ies] of concern"—China, Russia, Iran, North Korea, Cuba, Syria, and the Venezuelan regime under Nicolás Maduro, Fla. Stat. § 288.860(1)(a); *see also* Fla. Admin. Code R. 6A-14.097(1)(e); Fla. Univ. Bd. Governors Reg. § 9.012(1)(d)[2]—and presumptively bars them

---

[1] Press Release, Executive Office of the Governor Ron DeSantis, Governor Ron DeSantis Cracks Down on Communist China (May 8, 2023), https://tinyurl.com/nh9mmzja.

[2] Florida University Board of Governors regulations are available online at https://www.flbog.edu/regulations/active-regulations/.

from any kind of academic employment in Florida public universities and colleges. *See* Fla. Stat. §§ 288.860(1)(g)-(h), (3)(a)-(c); *see also* Fla. Admin. Code R. 6A-14.097(4)(a)-(b); Fla. Univ. Bd. Governors Reg. §§ 9.012(8)(a)-(b). SB 846 uses domicile in a foreign country of concern as a primary defining trait of a foreign principal, which includes:

> [a]ny person who is domiciled in a foreign country of concern and is not a citizen or lawful permanent resident of the United States.

Fla. Stat. § 288.860(1)(b)(4) (emphasis added); *see also* Fla. Admin. Code R. 6A-14.097(1)(g)(4); Fla. Univ. Bd. Governors Reg. § 9.012(1)(f)(4). Among the seven foreign countries of concern, SB 846 most heavily impacts Chinese nonimmigrants given that they comprise the vast majority of international students and professors eligible for academic employment in Florida public universities and colleges covered by SB 846. *See, e.g.*, Amy Qin, *Florida Law Chills Chinese Student Recruitment*, N.Y. Times (Dec. 22, 2023)[3] (reporting that China is "the largest source of international students at [the University of] Florida"; that "[i]n 2020, 1,100

---

[3] Available at https://www.nytimes.com/2023/12/15/us/florida-law-chills-chinesestudent-recruitment.html.

students—40 percent of the University of Florida's international graduate student body—came from China").

Individualized exemptions from SB 846's presumptive bar to academic employment may be obtained upon application to, and approval from, the State University System of Florida Board of Governors, or the Florida State Board of Education that oversees Florida public colleges, in specific cases where a "partnership or agreement" is deemed "to be valuable to students" as well as the state university or college and "is not detrimental to the safety or security of the United States or its residents." Fla. Stat. §§ 288.860(3)(d), (e); *see also* Fla. Admin. Code §§ 6A-14.097(4)(c)-(d); Fla. Univ. Bd. Governors Reg. §§ 9.012(8)(c)-(d). The Boards may punish any Florida public university or college that violates SB 846's academic employment limitations, through the loss of public funding and competitive grant eligibility. Fla. Stat. §§ 288.860(3)(d)-(e), *see also id.* §§ 1008.32(4)(b)-(c), §§ 1008.322(5)(a)-(b); Fla. Admin. Code R. 6A-14.097(4)(e); Fla. Univ. Bd. Governors Reg. § 9.012(8)(d).

## II.    The Students are legal F-1 visa holders.

Appellees Zhipeng Yin and Zhen Guo, are students at FIU. J.A. 99, 132. The Students come from China and are Chinese citizens, but they

7

are neither members of the CCP nor the Chinese government. J.A. 98, 131. Neither Yin nor Guo are United States citizens or lawful permanent residents, but they each have permission to be in the United States as holders of a valid F-1 nonimmigrant student visa, which authorizes each of them to engage in related academic work anywhere in the U.S. J.A. 98-99, 131-132; *see* 8 U.S.C. § 1101(a)(15)(F); 8 C.F.R. §§ 214.2(f)(1)(i), (f)(9)-(11). They obtained their F-1 visas only after satisfying an intensive federal national security screening as part of the "alien" registration process. *See generally* 8 C.F.R. §§ 212.1, 221.1, 264.1; 9 Foreign Affairs Manual §§ 303, 402.5, 403.1-403.9.

### A.    Zhipeng Yin's job offer is rescinded because of SB 846.

Yin is pursuing his doctoral studies in Computer and Information Sciences at FIU. J.A. 132. He first entered the United States in August 2021 to study, and while in New York in December 2023 he accepted an FIU offer to enroll in its Computer Science doctoral program, as well as its accompanying offer of a graduate teaching assistantship, with the contract set to commence on December 18, 2023, prior to the 2024 spring semester. J.A. 132 *id.* ¶¶ 8-11. This position included an annual stipend

of $27,510, a tuition waiver, and automatic enrollment in the FIU-sponsored graduate assistant health insurance program. J.A. 132.

In a letter dated January 9, 2024, FIU informed Yin that his job offer was deferred until approved under the new SB 846 process, which would take several months. J.A. 132. FIU also informed him that, until such approval, he would not receive a tuition waiver given that it was contingent on his teaching assistantship. J.A. 132. Pending approval of his offer under SB 846, Plaintiff Yin is paying his full FIU tuition costs out of his own pocket. J.A. 133.

## B.    Zhen Guo's job offer is rescinded because of SB 846.

Guo's story is much the same. Plaintiff Guo is pursuing his doctoral studies in Materials Engineering at FIU. J.A. 99. He first entered the United States on December 16, 2023 in furtherance of accepting a September 6, 2023 FIU offer for enrollment in its Department of Mechanical and Materials Engineering doctoral program, as well as an October 4, 2023 FIU letter confirming that enrollment offer as well as an accompanying teaching assistantship offer, with the contract set to commence on December 18, 2023, prior to the start of the 2024 spring semester. J.A. 99-100. As with Yin's offer, this position included an annual stipend of

9

$27,510, a tuition waiver, and access to FIU-sponsored health insurance. J.A. 99.

It was not until Guo had traveled from China and arrived in Florida that FIU informed him, in a letter dated December 20, 2023, that his job offer was deferred until approved under the new SB 846 process. J.A. 99. According to the letter, the process would take several months, and that until such approval he would not receive a tuition waiver given that it was contingent on his job. J.A. 99. Pending approval of his job offer under SB 846, Guo is also paying his full FIU tuition costs out of his own pocket. J.A. 99.

*    *    *

The graduate teaching positions do more than pay well. They are important parts of furthering Yin's and Guo's doctorate. "[C]lose work with a professor is a cornerstone of [their] doctoral studies and a GA position is a recognition of academic promise and a testament to the trust placed in [them] by FIU and its faculty." J.A. 100-101, 133.

As a result, both Students are suffering under SB 846 because FIU, under the Board's commands, is denying them academic employment as a result of deeming them domiciled in China within the meaning of Fla.

10

Stat. § 288.860(1)(b)(4).

## III. The Students obtain a preliminary injunction against the Board.

The Students, along with Professor Zhengfei Guan, brought suit to challenge SB 846 and moved for a preliminary injunction. J.A. 13. Professor Guan challenged SB 846 because, as an FIU professor, he was unable to hire Chinese job applicants for research and writing positions he was trying to hire for. J.A. 95-96. The District Judge referred Plaintiffs' preliminary injunction motion to a Magistrate Judge. J.A. 154. The Magistrate Judge's Report and Recommendation found that the Students (but not Professor Guan) had standing, J.A. 255. It went on to find that SB 846 was preempted because it created an unconstitutional obstacle to enforcing (1) federal immigration law's national security screenings and academic employment authorizations, J.A. 261-71, as well as (2) the federal power over foreign affairs. J.A. 261-71. The Report and Recommendation rejected the Students' Equal Protection claim. J.A. 271-76.

The District Judge then adopted the Report and Recommendation in full. J.A. 389. It granted the Students a statewide preliminary injunction against SB 846's enforcement. J.A. 389.

11

The Board appealed. J.A. 391-93. The Board then filed with the District Court a motion to stay the preliminary injunction pending appeal, which was denied. J.A. 395-401. It also filed its motion to stay with this Court, which remains pending.

## SUMMARY OF ARGUMENT

SB 846 specifically entrusts enforcement not to individual state universities but to the Board of Governors and the State Board of Education. Those entities, and those entities only, have the sole discretion to permit or deny Chinese F-1 visa holders like the ones in this case from holding employment. If the Board is enjoined here, then the Students will have the right to be employed by FIU if FIU wants to hire them. If the Board is not enjoined, then both the Students and FIU are powerless. The Students therefore have standing to sue the Board over SB 846.

SB 846 is preempted by federal immigration law. Federal immigration law expressly provides F-1 visa holders approved by the federal government to hold certain employment with their schools. While of course universities have discretion to refuse to hire someone (though not for impermissible reasons), SB 846 does not give universities the authority to

12

use that discretion. Rather, SB 846 forbids universities from hiring Chinese F-1 visa holders, unless the Board of Governors or Board of Education, in their regulatory capacity, permits an exception. And that exception would be based on the same consideration—national security—that the federal government already considered in approving the F-1 visa and employment authorization. SB 846 is preempted.

Even if not preempted, SB 846 violates the Equal Protection Clause. Discrimination on the basis of national origin, as well as discrimination on the basis of legal immigration status, is subject to strict scrutiny. But even if it were subject to only rational basis scrutiny, the only government interest that Florida relies on in denying Chinese F-1 visa holders the ability to work is a national security interest. And so even if Florida otherwise had a legal right to deny employment by state universities to Chinese F-1 visa holders, discriminating against them in hiring for a preempted reason cannot survive even rational basis scrutiny.

And because SB 846 is facially invalid in its entirety, and because it is preempted by federal immigration law, a statewide injunction is appropriate.

13

## ARGUMENT

### I.    The Students sued the right government officials.

Standing requires a showing of injury, traceability, and redressability. *Jacobson v. Florida*, 974 F.3d 1236, 1245 (11th Cir. 2020). Redressability and traceability are "closely related" and "often overlap." *See, e.g., Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009); *see also Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021) ("travel together"). Here, the Students have standing because SB 846 is causing their harm, that harm is a result of the Board's power to force FIU to apply to the Board for an exemption that can be granted only at the Board's discretion, and only injunctive relief against the Board, and not against FIU, can redress that harm. *See Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006) (a single plaintiff having standing is sufficient, and upon finding, the Court need not address the standing of other parties).

### A.    The Students' injuries were due to the Board's enforcement authority under SB 846.

The Board (at 22-25) contends that the Students' injuries are traceable only to FIU because FIU did not submit SB 846 exemption requests.

But all that is required for traceability is some "factual causation . . . between [a plaintiff's] injuries and the defendant's misconduct," in which "the defendant's challenged conduct need not be the very last step in the chain of causation." *Walters v. Fast AC, LLC*, 60 F.4th 642, 650 (11th Cir. 2023) (internal quotations and citations omitted).

And here, the Students' injuries all flow directly from SB 846 and the Board's enforcement discretion over it. The Board is responsible for imposing the arduous and time-consuming administrative burdens to request an SB 846 exemption, Fla. Stat. § 288.860(3)(d), which requires four levels of review before an applicant is even permitted to submit an exemption request, after which months may pass before the Board of Governors provides an answer. J.A. 367. Realistically, this SB 846 exemption process will take about half a year or more to unfold. J.A. 96, 100, 133. And if FIU hires without obtaining Board approval, the Board will impose significant penalties on FIU. Fla. Stat. § 288.860(3)(d)(1); Fla. Stat. § 1008.322(5). The Board is thus responsible for this entire SB 846 process, all of which is on the factual continuum that has caused the Students' injuries. *Walters*, 60 F.4th at 650. That FIU could submit an exemption application does nothing to stop the Board's powers and

15

responsibilities under SB 846, which are direct, superior, and controlling. Nor does it change the fact that the exemption application is required by and submitted to the Board. Fla. Stat. § 288.860(3)(d). So, it is immaterial that FIU never submitted an application for approval of Yin or Guo.

*City of South Miami v. Governor of Florida*, 65 F.4th 631 (11th Cir. 2023), does not alter this conclusion. There, the plaintiffs lacked standing to sue the Florida Governor and Attorney General while challenging a state law directed at local officials because traceability latched only to the local officials. *City of S. Miami*, 65 F.4th at 634-35, 640-45. The state's enforcement role required the state to invoke judicial process against local officials, undermining traceability. *Id.* at 642-43. By contrast, SB 846 explicitly and directly charges the Board with implementation and enforcement.  Fla. Stat. Ann. § 288.860(3)(d). The Board has direct enforcement power through imposing loss of public funding and grant eligibility, which do not require invoking judicial process. *Id.*; *see also* Fla. Stat. § 1008.322.

> **B.    Only enjoining the Board from enforcing SB 846 would properly redress the Students' injuries.**

Even if the Students successfully sued FIU, they would remain in

16

the same position because FIU has no power to alter SB 846's enforcement. So, no remedy is available against FIU that would free the universities from having to follow the SB 846 pre-approval process that the Board mandates and for which it is responsible, nor guarantee the success of that process. To determine traceability, Courts look to "***the effect of the court's judgment on the defendant***," not on "an absent third party" such as FIU, "that redresses the plaintiff's injury, whether directly or indirectly." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (internal quotations and citations omitted) (emphasis original). The Students' injuries are redressed only by freeing the universities from proceeding through the Board's SB 846 administrative gauntlet. *See id.*; *see also Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 79 (1978).

The Board contests redressability (at 24) because "there is no evidence that FIU would then employ the student[s]" even if the Board is enjoined. "To conclude otherwise, one must assume that FIU would disobey the law," *id.* (citations omitted). But a state officer's noncompliance with a law whose enforcement has been enjoined is not disobedience.

17

*Cooper v. Aaron,* 358 U.S. 1, 11-12, 17-19 (1958). And the Board's evidentiary assertion is incorrect in any event because FIU actually did offer the Students academic employment, before expressly rescinding those offers solely due to SB 846. J.A. 369. *South Miami* is not to the contrary. That case addressed state officers' preexisting "obligation" to enforce the law in a nondiscriminatory manner, 65 F.4th at 643, not any so-called "obligation" to apply a law whose enforcement has been enjoined.

### C.    SB 846 made the Board the proper defendant to be sued.

Although not stated expressly, the heart of the Board's standing argument is that the correct *Ex Parte Young* defendant under SB 846 is FIU. But the Board is imagining a different statute. If SB 846 put enforcement authority in the hands of the universities, then FIU would be the appropriate *Ex Parte Young* defendant. But it did not. Instead of trusting FIU and other state colleges to enforce the statute, it put the Board of Governors in charge. For FIU and other universities under its supervision, the Board of Governors, not FIU, gets to decide whether a "partnership or agreement" with a "person domiciled in a foreign country of concern and [who] is not a citizen or lawful permanent resident of the United States" is "valuable to students and" FIU. Fla. Stat.

18

§§ 288.860(1)(b) & (3)(d).[4]

The Florida legislature was quite explicit about putting enforcement authority in the hands of the Board. The state universities were given no enforcement authority to do anything. Rather, they (and not foreign students such as the ones here) are the immediate regulated entities of SB 846. (Foreign students are also regulated, but only indirectly.) In contrast, "the state board" was the one that "shall exercise the authority provided" by the Florida Legislature. Fla. Stat. § 288.860(3)(d)(1); *see also id.* at § (3)(d)(2).

If there is any doubt who the proper defendant is, consider a statute that applied to private schools in the state of Florida as well. Under this hypothetical statute, they, too, could suffer consequences if these private schools hired certain foreign students without permission of the State Board of Education. In this hypothetical, the foreign students in question are at the University of Miami (a private institution). The University of Miami would, in theory, like to hire the foreign students, but decided the

---

[4] For state colleges not under the supervision of a Board of Governors, SB 846 grants the State Board of Education the enforcement authority. Fla. Stat. § 288.860(3)(e).)

19

costs and delay with complying with the approval process were too oner-ous. Would the University of Miami be the proper defendant in a lawsuit alleging violations of the Supremacy and Equal Protection Clauses? Or would there be no defendant at all? Under the Board's logic, so long as the Florida Legislature made the process of getting hiring approval oner-ous enough for private universities, foreign students harmed by this hy-pothetical statute would simply have no recourse whatsoever.

The fact that FIU is a public university changes nothing. And, in fact, FIU could not be a proper defendant, as it has Eleventh Amendment Immunity. *Maynard v. USF*, 342 F.3d 1281, 1288 (11th Cir. 2003). (So does the Board of Governors as an institution, which is why their mem-bers are the ones being sued in this case). In theory, the individual offi-cials responsible for the decision not to hire students covered by SB 846 might be proper defendants for some particularly narrow relief. But since they have no enforcement authority, any injunction against them would be incomplete. Maybe an injunction against them could require them to submit a request for an exception to the Board under SB 846. But that is simply an order enforcing the unconstitutional statute, not one setting it aside. If an injunction required the officials to hire the foreign students,

20

then FIU would be subject to the severe penalties listed in SB 846. At best, the Board's argument would require two separate suits (including one by a university against its own board) to render the law unconstitutional. But no theory of Article III requires such complexity and risk of inconsistent judgments.

## D.    The Board's fingerpointing at FIU does not avoid standing.

The Board's arguments to the contrary don't work in light of the statutory structure.

The Board's argument (at 24) "that [] plaintiffs' real problem is with FIU, not with the Board," is factually wrong. (Cleaned up) (citing *Support Working Animals, Inc. v. Gov. of Fla.*, 8 F.4th 1198, 1203 (11th Cir. 2021)). The background shows that FIU wanted to hire the Students. *See also* J.A. 376. The problem was that FIU could not hire the students without getting the Board's approval. *Id.* The problem was—as the Legislature intended—with the Board, since the Board was the entity tasked with enforcing SB 846.

And, indeed, the Board appears to understand this (at 22-23), citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992), to suggest that the Students' burden of proving standing is harder because SB 846 regulates

21

the behavior of FIU rather than the Students. But the Board's argument there is not right either, because while SB 846 does indeed regulate FIU's behavior, the "object" of the regulation remains the Students that the State of Florida has deemed a national security threat. 504 U.S. at 562.

Likewise, the Board's argument (at 24) that standing against the Board presumes "that FIU would disobey the law (i.e., shirk its obligation to seek Board approval and then employ Plaintiffs on campus) absent the threat of sanction," misses the mark. Of course, once the law is enjoined against the Board, FIU has no obligations under the law. FIU's only obligation under the law is to seek preapproval from the Board to hire students like the ones here. But if the Board is restrained from requiring that preapproval, there is no preapproval process for the FIU to perform. The injunction against the Board frees FIU to do as it pleases within the boundaries of other laws.

The standing analysis here is no different than when TikTok, its subsidiary ByteDance, and two users sued the Attorney General over the TikTok ban. *TikTok Inc. v. Garland,* 145 S. Ct. 57, 65 (2025). The law in question did not bar TikTok from doing anything, but barred other entities from distributing, maintaining, or updating TikTok's application.

22

Had the law been found unconstitutional and the Attorney General enjoined, nonparties such as Amazon, Apple, and Google would not be presumed to be shirking their obligations by hosting TikTok. Instead, they would be deemed free to maintain TikTok on their servers without violating the unconstitutional law, just as they are doing now given the President's Executive Order declining to enforce the law.

Cases like *South Miami*, 65 F.4th 631, involve a different inquiry altogether. SB 168 directly entrusted enforcement of the anti-sanctuary-city law to state and local officers. *Id.* at 635. Although the law at issue created a state board of Immigration Enforcement, that board was given no authority to enforce the law. Fla. Stat. §§ 908.101–908.109. And although one provision noted that the Governor had powers to punish non-compliance, that was, as this Court pointed out, simply a "boilerplate" provision that "recognizes the governor's constitutional powers." 65 F.4th at 643. This is simply not a case where the Board of Governors "had never enforced or threatened to enforce the law and the law itself contemplated no role for the" Board. *Id.* at 641-42 (citations omitted).

*    *    *

The Students would like FIU to hire them. And what is stopping

23

them is not that FIU will refuse to hire them because FIU is enforcing an unconstitutional statute, but that FIU is (a) afraid of hiring them because of the concern that the Board will use its enforcement authority to punish FIU for doing so, and (b) unwilling to go through the expense and delay of seeking approval from the Board in order to get the Board to waive its enforcement authority under SB 846. If an injunction issues against the Board, then the FIU can hire the Students without fear, expense, or delay, inuring to the benefit of the students. In other words, the Students' injuries are both traceable to and redressable from the Board. And that is because the Florida Legislature made the Board, rather than FIU, the enforcing authority under SB 846.

## II.    SB 846 is preempted by the Government's F-1 Visa Program.

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). "Federal governance of immigration and alien status is extensive and complex." *Id.* at 395. Federal immigration authority "rests, in part, on the National Government's constitutional power 'to establish an uniform Rule of Naturalization,' and its inherent sovereign power to control and conduct foreign relations." *Id.*

24

at 394-95. As a result, "any state law that regulat[es] … immigration is unconstitutional." *Estrada v. Becker*, 917 F.3d 1298, 1303 (11th Cir. 2019).

As a result, "[s]tate law" must "give way …. in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. It must also give way when it "conflict[s] with federal law." *Id.* Such conflict not only occurs "where compliance with both federal and state regulations is a physical impossibility," but also "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (cleaned up).

The District Court below found SB 846 preempted under conflict, rather than field preemption. J.A. 261-71. Whether the Court relies on field preemption or conflict preemption is immaterial. SB 846 "stands as an obstacle" to the pervasive regulation of foreign students and when they can and cannot work in the United States as part of their course of study. *Arizona*, 567 U.S. at 399.

## A.  The F-1 visa program comprehensively regulates student employment.

The F-1 visa program is a comprehensive program regulating the

25

admission of foreign students. 8 U.S.C. §§ 1101(a)(15)(F), 1184(a)(1); 8 C.F.R § 214.2(f). The program regulates (among other things) what universities may admit foreign students, 8 C.F.R. § 214.2(f)(1)(i), how many classes they must take, 8 C.F.R. §§ 214.2(f)(5)(v), (6)(i), (6)(iii), how long they may study, 8 C.F.R. §§ 214.2(f)(5)(i), (7)(i), how much vacation they can take, 8 C.F.R. § 214.2(f)(5)(iii), whether and how they may transfer schools, 8 C.F.R. § 214.2(f)(8), the terms of admission for their family, 8 C.F.R. §§ 214.2(f)(3), (15), and, importantly here, when and how they may work, 8 C.F.R. §§ 214.2(f)(8)-(14). The conditions of employment—whether that employment can be on campus or off campus, the amount of hours an F-1 visa holder may work, the reporting requirements of the F-1 visa holder for employment, are laid out in detail in the F-1 visa program regulations. 8 C.F.R. § 214.2(f)(9).

And the F-1 visa program is clear. F-1 students have an express right to work on campus so long as they comply with the conditions listed in the F-1 visa program: "An F–1 student may engage in any on-campus employment authorized under this paragraph (f)(9)(i) which will not displace United States residents." 8 C.F.R. § 214.2(f)(9)(i). Indeed, "[o]n-campus employment pursuant to the terms of a scholarship, fellowship,

26

or assistantship" is "deemed to be part of the academic program of a student otherwise taking a full course of study," 8 C.F.R. § 214.2(f)(6)(i)(H).

Student employment is part and parcel of the F-1 visa program. Of course it is. As the Students' own stories illustrate, it is difficult, almost impossible, to get through a graduate program without being employed as a student teaching assistant or researcher. J.A. 133-35. And even for undergraduate students, as there are specific financial requirements for maintaining an F-1 visa, 8 C.F.R. § 214.2(f)(1)(i)(B), the ability to work on campus (and the F-1 visa program specifically limits employment in the first year to on campus employment, 8 C.F.R. § 214.2(f)(9)(ii)(A), can be vital to maintaining one's visa and course of study. *See Maine Forest Prods. Council v. Cormier*, 51 F.4th 1, 11 (1st Cir. 2022) ("we would not lightly adopt a reading of this regulation that would require federal officials to deny H-2A visas because of a state law specifically targeting the H-2A program.").

### B.    SB 846 contradicts federal student work authorization.

SB 846 stands in sharp contrast to the F-1 visa work authorization. Under SB 846, at least public universities in Florida are not allowed to

employ F-1 student visa holders from China unless they get specific authorization from, depending on the school, either their Board of Governors or the State Board of Education. Fla. Stat. §§ 288.860(3)(d), (e). That authorization is dependent on a finding by the relevant board that employment is "valuable to students and the state university and is not detrimental to the safety or security of the United States or its residents." *Id.*

But, as the District Court pointed out, whether or not employment is "detrimental to the safety or security of the United States or its residents" is inherently a question of national importance which is already covered by the federal F-1 visa approval process, 8 U.S.C. § 1182(a). J.A. 268. "SB 846's application to students who have been granted student visas serves no purpose other than to revisit, question, and potentially seek to override the federal immigration determination that the pertinent student does not pose a national security concern." J.A. 268 (Report & Recommendation). The state government sits in "what is essentially a review of "the federal immigration system's national security determination." J.A. 268-69. And the Board's complaints (at 31-33) that the federal government's review is "limited" and insufficient as it relates to graduate

28

assistantships is beside the point. It is not up to the Board to second guess the federal government's security determinations.

This alone renders SB 846 preempted. While the State of Florida may have an interest, and even the same interest, in national security that the Federal Government does, a state law that "attempts to achieve one of the same goals as federal law" may be preempted when "it involves a conflict in the method." *Arizona*, 567 U.S. at 406. And denying a "work authorization" that has been granted by the federal government is "at odds" with the Federal grant. *Maine Forest*, 51 F.4th at 11 (finding preemption when, based on desire to protect domestic labor market, Maine denied work licenses to individuals with H-2A work authorization); *see also generally ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1296 (S.D. Fla. 2008) (restrictions on doing business with Cuba preempted as naked political attempt to undermine the Federal Government's decision to permit such business); *Odebrecht Const., Inc. v. Prasad,* 876 F. Supp. 2d 1305, 1308 (S.D. Fla. 2012) (same even as to a statute affecting only state and local government contracts), *aff'd sub nom. Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.,* 715 F.3d 1268 (11th Cir. 2013).

29

What's more, because Florida F-1 visa students will be practically unable to maintain their F-1 status without access to school employment, *see* § A, above, SB 846 is "in tension with the structure and purpose of the [F-1] statutory provisions and would effectively give states a veto power over the federal program." *Maine Forest*, 51 F.4th at 11. Such a veto power over federal law is not permitted by the Supremacy Clause.

## C.    SB 846 also interferes with federal foreign affairs.

And, as the Board's own Brief makes clear (at 8), the target of SB 846 as "Florida's 'adversary'" is not the Students, but China itself. As a result, any analysis by the Board into whether a student's employment "is not detrimental to the safety or security of the United States or its residents," Fla. Stat. § 288.860(d), will require a determination about China's threat to the United States. This would require "minute inquiries concerning the actual administration of foreign law" and "into the credibility of foreign diplomatic statements" that would intrude on the federal government's foreign affairs powers. *Zschernig v. Miller*, 389 U.S. 429, 435 (1968).

The Board claims (at 32-33) that *Zschernig* is limited to its facts.

30

*Id.* at 34. Not so. As this Court made clear as recently as 2010, preemption based on the foreign affairs power alone is possible and remains valid. *Fac. Senate of Fla. Int'l Univ. v. Winn,* 616 F.3d 1206, 1211 (11th Cir. 2010). The inquiry is whether, in the challenged act's application, Florida "is asking … for proof about the conduct of any foreign government or making a judgment about that conduct which is apart from the federal government's own announced judgment." *Id.* And that is precisely what is happening here. It is precisely for this potential for inconsistent statements about the security threat posed by China and Chinese students that courts must be "especially mindful of state laws that might undermine the exercise of the President's large discretion in this area." *Odebrecht*, 715 F.3d at 1285. So, even if the foreign affairs power alone is insufficient grounds to find preemption, the combination of that concern and the actual conflicts with the F-1 visa program combine to make SB 846 "run[] afoul of the Supremacy Clause." *Id.* at 1287.

Nor is the foreign affairs issue hypothetical. The issue of Chinese student visas was part of the recent tariff negotiations between the

31

United States and China. Ben Berkowitz, *Trump says China deal includes magnets, student visas*, Axios (June 11, 2025).[5] Florida's contrary position effectively denying Chinese students in Florida the full rights to their visas threatens to undermine the President's ability to conduct bilateral agreements with China and other foreign countries.

### D.   SB 846 is a regulation of employment, not a discretionary choice of whom to employ.

The Board's arguments on preemption all suffer from the same problem that defeats its standing arguments. Rather than accept SB 846 as what it is a—a regulatory scheme where the Board prohibits FIU from employing Chinese (and other) F-1 students without the Board's permission—the Board (at 27) presumes a different scheme, where FIU is simply using its "hiring discretion." But that's not right. FIU wants to use its "hiring discretion" to hire the Students. It is forbidden by SB 846, which is imposed on it by the Board. Fla. Stat. § 288.860(d). The Board not only has the authority to enforce the law but also has the discretion to waive its requirements, based on its determinations of the national security interests of the United States. *Id.*

---

[5] Available at https://www.axios.com/2025/06/11/trump-china-tariffs-magnets-visas.

The issue in this case isn't whether the FIU has the authority to deny the Students admission to its programs, or whether it has the authority to refuse to hire the students, generally. It did. It is not even whether FIU had the authority to decline to admit or hire the Students for an impermissible reason—whether that reason was because of their Chinese background, or because of its disagreement with the United States on the United States' regulation of the F-1 visa program. *See also* § III, below. Rather, it is whether the Board can stand in review of the F-1 visa program's and the Federal Government's determinations that the Students' F-1 visa employment did not state a security threat to the United States or its citizens.

### E. The Board cannot avoid preemption by claiming a role as a mere market participant.

Even if this were a case about FIU invoking its discretion not to hire the Students rather than the Board forbidding FIU from doing so, SB 846 would still be preempted. Florida made the same arguments about its "choice of how to allocate and spend public funds" being not subject to preemption in *Odebrecht*, 715 F.3d at 1286. But as this Court noted there, the use of its purse rather than the police power was simply irrelevant. *Id.* Likewise, this Court noted that while the state's decision

33

not to travel to Cuba was a "minimal" and "incidental" brush with federal law permitting such travel, the decision to specifically prohibit others from doing something the Federal Government had sanctioned—there, doing business with Cuba, here, allowing Chinese F-1 students to work— was unlawful. *Id.* And that was true even if the prohibition was limited to the state's own commercial interactions. *Id.* at 1287.

### F.    *Estrada* does not permit denying F-1 visa holders rights granted by the federal government.

*Estrada v. Becker*, 917 F.3d 1298 (11th Cir. 2019), provides no solace to the Board. As *Estrada* itself explains, the Board cannot "regulate immigration, even if Congress has not expressly or impliedly preempted the state regulation," and cannot determine "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *Id.* at 1303. So when that law allowed the State of Georgia to forbid admission of undocumented immigrants to its universities, this Court upheld that authority precisely because the federal scheme (despite the existence of DACA) specifically denied undocumented immigrants the right to "state and local benefits, including postsecondary education benefits." *Id.* at 1308 n.12.

Meanwhile, it distinguished two U.S. Supreme Court cases that

34

specifically forbade states from prohibiting legal "aliens" access to state benefits, *Graham v. Richardson,* 403 U.S. 365 (1971), and *Nyquist v. Mauclet*, 432 U.S. 1, 7 (1977), specifically on the fact that the Georgia law was consistent with federal regulation of undocumented immigrants, while the *Nyquist* and *Mauclet* laws were inconsistent with federal regulation of legal "aliens." *Estrada*, 917 F.3d at 1309. "[A]s the Supreme Court later clarified, the state laws at issue in Nyquist and Graham 'struck at the noncitizens' ability to exist in the community, a position seemingly inconsistent with the congressional determination to admit the alien to permanent residence.'" *Id.* (quoting *Foley v. Connelie*, 435 U.S. 291, 295(1978)). But that is exactly what this law does as to F-1 visa holders.

Admittedly, *Nyquist* and *Graham* are Equal Protection cases. But in *Toll v. Moreno*, the Supreme Court relied on both those cases in finding that a state law denying ***legal*** visa holders in-state tuition was federally preempted. 458 U.S. 1, 17 (1982). And that was true even though, of course, a state university has the discretion to choose what it charges for tuition. A similar logic applies here. Federal law preempts the Board from prohibiting FIU from hiring the Students due to their F-1 status

35

when such hiring is permitted by their F-1 visa.

### G. PRWORA does not give the Board the right to deny work authorization to the Students.

Finally, the Board's argument (at 20 and 28) premised upon the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), misinterprets PRWORA. PRWORA promotes welfare work requirements. Though Congress could validly modify the underlying federal statutes or regulations to explicitly clarify an intent that preemption not apply, *see PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620-21 (2011), in neither PWORA nor any other federal statute or statutory regime has Congress done so.

### 1. PRWORA does not apply to employment permitted by an F-1 visa work authorization.

First off, 8 U.S.C. § 1621(c)(1), the benefits that a state may modify under PRWORA, does not apply to a general right to employment. That section applies to "any grant, contract, loan, professional license, or commercial license provided by an agency of a State or local government or by appropriated funds of a State or local government." But a general work authorization is not a professional or commercial license. And while in one sense you could define a contract to include a job (or, against the

canon of surplusage, a loan or a grant), the meaning of a government contract is ordinarily considered quite differently from employment. *See New Vision Photography Program, Inc. v. D.C.*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) (citing five different circuits for the proposition that employment and government contracts are different because employment due-process principles attach to employment). If PRWORA was to apply to employment itself, it would have said so clearly. *See also Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510-11 (2018) (internal quotations and citations omitted) (law's intent to conflict and displace an older law "must be clear and manifest," with a "stron[g] presum[ption] that repeals by implication are disfavored").

But even if Section (c)(1)'s use of the word "contract" opened the door to SB 846, Section (c)(2) would shut it. Under Section (c)(2), Section (c)(1) cannot apply to "any contract, professional license, or commercial license for a nonimmigrant whose visa for entry is related to such employment in the United States." And as described in detail above, the ability to work for a university is related to an F-1 visa. So, when 8 U.S.C. § 1622(a) allows Florida "to determine the eligibility for any State public

37

benefits" of the Students, that does not include the eligibility to be employed by the Students' universities as approved by the Students' F-1 visas.

### 2. PRWORA does not allow Florida to make new F-1 classifications of favored and unfavored F-1 visa holders.

Even if one ignored the plain language of Section 1621(c), the Board's state-discretion argument proves too much. Such an argument would free Florida from conforming to the extensive and detailed federal statutory and regulatory requirements with which universities must comply in academically employing F-1 student visa holders, and even allow Florida to violate federal laws such as employment anti-discrimination measures. This is an inversion of federalism that would violate the constitutional order. *See Cooper*, 358 U.S. at 11-12, 17-19.

For much this reason, the Ninth Circuit rejected Arizona's argument that PRWORA allowed Arizona to deny drivers licenses to certain immigrants. *Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 975 (9th Cir. 2017). "Arizona's policy is preempted because, in determining which aliens shall be eligible to receive a state benefit, Arizona created new im-

migration classifications based on its independent view of who is author-ized under federal law to be present in the United States." *Id.* Even if this were simply a case about the government choosing to hire (a public ben-efit) and even if there was a reading of PRWORA that would allow Flor-ida to deny that employment to visa holders in general, it cannot create a new set of supposedly dangerous Chinese F-1 visa holders, and deny them employment as a new class.

**H.    There is no "no set of circumstances" test for preemp-tion.**

Finally, the Board claims (at 36-38) that even if SB 846 is preempted, the Students must show that it is preempted in all circum-stances. But this "misstates the law governing facial challenges." *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022). When it comes to preemption, the question instead "is whether the statute fails the relevant constitutional test (in this case, the standard for federal conflict preemption discussed above)." *Id.* That question, in turn, is whether its relevant requirements generally "obstruct[] federal law." *Id.* As explained above, they do. To require a Court to "reject a con-flict preemption claim in a facial challenge whenever a defendant can

39

conjure up just one hypothetical factual scenario in which implementation of the state law would not directly interfere with federal law," *id.*, would fundamentally alter the proper analysis. *Lozano v. City of Hazleton*, 724 F.3d 297, 313 (3d Cir. 2013), *quoted by Club Madonna*, 42 F.4th at 1256. It would also mean that "[s]tates and municipalities could consistently sidestep facial challenges and the unambiguous command of federal law so long as they crafted some instance when the state or municipal law at issue aligned with federal objectives." *Club Madonna, id.* That "can't be right." *Id.*

## III.   SB 846 violates the Equal Protection Clause,

This court can affirm the District Court's injunction on any ground in the record. *Waldman v. Conway,* 871 F.3d 1283, 1289 (11th Cir. 2017). Because SB 846 violates the Equal Protection Clause, the Court should affirm the injunction even if it does not find SB 846 preempted.

SB 846 facially targets Plaintiffs Yin and Guo based upon the suspect classification of alienage, and uses the proxy of domicile to discriminate against them based upon national origin and race, using those classifications to encroach on their federal right to work in violation of the

40

Equal Protection Clause. The Fourteenth Amendment "entitles both citizens and aliens to the equal protection of the laws of the State in which they reside." *Graham*, 403 U.S. at 371; *see also Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). The Students, having been lawfully admitted under federal immigration laws, enjoy an accompanying federal "right to work for a living in the common occupations"—in any state—lest the Fourteenth Amendment become "'a barren form of words.'" *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 415-16 (1948) (quoting *Truax v. Raich*, 239 U.S. 33, 41 (1915)). Legislative measures discriminating based upon the suspect classifications of alienage, national origin, and race must pass the most rigorous of tests—strict scrutiny. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985); *Bernal v. Fainter*, 467 U.S. 216, 219-22 & n.5 (1984). Strict scrutiny requires that "the statute be narrowly tailored to achieve a compelling government interest." *Williams v. Pryor*, 240 F.3d 944, 947 (11th Cir. 2001).

### A.    SB 846 discriminates on the basis of race and nationality.

SB 846 facially classifies based upon domicile, see Fla. Stat. §§ 288.860(1)(a), (b)(4); Fla. Univ. Bd. Governors Reg. §§ 9.012(1)(d), (f)(4), but as a proxy for national origin and race discrimination in violation of

41

equal protection guarantees.

Courts must be vigilant in examining proxy discrimination because, though the "law itself be fair on its face, and impartial in appearance" it can be applied "with an evil eye and an unequal hand." *Yick Wo*, 118 U.S. at 373-74. Discriminating against suspect classes by proxy violates the Equal Protection Clause. *See Rice v. Cayetano*, 528 U.S. 495, 514, 516-17 (2000) (recognizing that "[a]ncestry can be a proxy for race," and where "[t]he ancestral inquiry mandated by the State implicates the same grave concerns as a classification specifying a particular race by name" then "[i]t is that proxy"); *McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992) (discriminatory proxy classifications include "using gray hair as a proxy for age"). Domicile, like ancestry, is a ready proxy for national origin or race discrimination. The "use [of] a technically neutral classification as a proxy to evade the prohibition of intentional discrimination" does not shield a law from equal protection review because "[p]roxy discrimination is a form of facial discrimination." *McWright*, 982 F.2d at 228; *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013). Statutes that discriminate against protected classes by proxy are subject to strict scrutiny. *See Johnson v. California*,

42

543 U.S. 499, 505, 511 (2005); *Bush v. Vera*, 517 U.S. 952, 968 (1996).

SB 846's use of domicile is a classic form of proxy discrimination. Likely acknowledging that targeting U.S. citizens and lawful permanent residents of Chinese background would be obviously constitutional, SB 846 targets all other individuals domiciled in the seven foreign countries of concern, including China. Fla. Stat. §§ 288.860(1)(a), (b)(4); Fla. Univ. Bd. Governors Reg. §§ 9.012(1)(d), (f)(4). In the case of China, though the statute facially uses the neutral term of domicile, in practice and by intent it will mostly or only affect those with a national origin of China, who are almost entirely Asians. Thus, through the proxy of domicile, SB 846 effectively discriminates on the basis of national origin and race, classifications entitled to heightened constitutional protections, because in "proxy discrimination the defendant discriminates against individuals on the basis of criteria that are almost exclusively indicators of membership in the disfavored group." *Graham*, 403 U.S. at 372; *Pac. Shores Props.*, 730 F.3d at 1160 n.23.

The District Court rejected the Students' proxy arguments below because "unlike race, ancestry, or national origin, which are immutable characteristics established at birth, domicile is not fixed at birth." J.A.

43

273. Of course, domiciliary does not perfectly overlap with national origin; otherwise, the statute would facially discriminate on the basis of national origin. "Simply because a class . . . does not include all members of the race does not suffice to make the classification race neutral." *Rice*, 528 U.S. at 516-17; *Davis v. Guam*, 932 F.3d 822, 838 (9th Cir. 2019) ("[P]roxy discrimination does not require an exact match between the proxy category and the racial classification for which it is a proxy.").

Discriminatory intent can be inferred here from SB 846's own stated purpose. The stated purpose of the law was to "combat . . . higher education subterfuge carried out by the CCP and its agents" and "to root out Chinese influence in Florida's education system." DeSantis Press Release; *see also* Brief of Appellant at 8 (stating that the target of SB 846 was China as a political adversary). But if that is the purpose, why include people who live in China but who are not members of the Chinese Communist Party? Fla. Stat. § 288.860(1)(b)(4); *compare with* S.B. 17, 89 Leg., Reg. Sess. (Tex 2025)   (to be codified at Tex. Prop. Code §§ 5.253(4)(E) & (4)(A)) (distinguishing between members of the Chinese Communist Party, who are outright prohibited from any land ownership, and Chinese citizens who are not members, who may purchase a single

44

homestead).[6]

Likewise, why exclude members of the Chinese Communist Party who have domiciled themselves outside of China? *See* S.B. 17 (to be codified at Tex. Prop. Code § 5.253(4)(B)) (covering Chinese citizens who are domiciled in other countries). Chinese agents, spies, and diplomats could often live abroad. *See id.* at § (4)(D) (covering Chinese agents regardless of citizenship, unless they are U.S. citizens or green card holders). But SB 846 excludes these people from its restrictions because SB 846 is targeted at Chinese people, not the Chinese government or people who happened to be domiciled in China. The Florida legislature knew that saying so explicitly would be unconstitutional. But saying so only implicitly does not insulate the law from its unconstitutional purpose.

### B.    SB 846 is subject to strict scrutiny because it facially discriminates against nonimmigrant alienage status.

In any event, SB 846 facially discriminates against the federal employment rights of nonimmigrants, a constitutionally protected subclass of "aliens." "Aliens" are "persons" under the Fourteenth Amendment and

---

[6] Of course, that the Florida law is even more facially discriminatory and less tailored than the Texas law does not mean the Texas law targeting Chinese people is constitutional.

45

thus are entitled to equal protection, including with regard to their right to work. *Graham*, 403 U.S. at 375; *Sugarman v. Dougall*, 413 U.S. 634, 641 (1973); *Application of Griffiths*, 413 U.S. 717, 719-20 (1972). This general constitutional protection based on alienage extends specifically to the nonimmigrants that SB 846 targets because nonimmigrants are "one subclass" of "aliens" under federal immigration law. *Dandamudi v. Tisch*, 686 F.3d 66, 75 (2d Cir. 2012).

SB 846 facially discriminates on the basis of alienage and thus is subject to strict scrutiny. FIU is discriminating against Plaintiffs Yin and Guo under SB 846 by deeming them domiciled in China, one of SB 846's seven countries of concern, while exempting United States citizens and green card holders, depriving them of their ability to work based upon their alienage status. Fla. Stat. §§ 288.860(1)(a), (b)(4); Fla. Univ. Bd. Governors Reg. §§ 9.012(1)(d), (f)(4); J.A. 132-33 Yin Decl. ¶¶ 13-14; Guo Decl. ¶ 14.

Alienage discrimination is subject to strict scrutiny review. *See, e.g., City of Cleburne*, 473 U.S. at 440; *Bernal*, 467 U.S. at 219; *Graham*, 403 U.S. at 376; *United States v. Osorto*, 995 F.3d 801, 811 (11th Cir. 2021); *Rodriguez ex rel. Rodriguez v. United States*, 169 F.3d 1342, 1347 (11th

46

Cir. 1999). Strict scrutiny also applies to SB 846 due to its specific discrimination against nonimmigrants. The Students have nonimmigrant status under their F-1 student visas. 8 U.S.C. § 1101(a)(15)(F). The Second Circuit applies strict scrutiny to discrimination against nonimmigrants, who by definition are lawfully present. *Dandamudi*, 686 F.3d at 72-74.

Though a circuit split exists as to whether legal nonimmigrant discrimination is subject to strict scrutiny, *see Van Staden v. St. Martin*, 664 F.3d 56, 58-60 (5th Cir. 2011); *LeClerc v. Webb*, 419 F.3d 405, 417-19 (5th Cir. 2005); *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 533 (6th Cir. 2007), the Second Circuit correctly reasons that the Supreme Court "has never held that lawfully admitted aliens are outside of Graham's [strict scrutiny] protection" and "has never distinguished between classes of legal resident aliens." *Dandamudi*, 686 F.3d at 74. Neither has the Eleventh Circuit.

The District Court relied on the Fifth Circuit's decision in *LeClerc*. J.A. 274. Respectfully, as detailed in *Dandamudi*, *LeClerc* was wrongfully decided. 686 F.3d at 75-78. The District Court nevertheless felt bound to follow *LeClerc* because it was favorably cited in *Estrada*, 917

47

F.3d at 1309-1310. *Id.*

But *Estrada* doesn't go that far. *Estrada* merely held that "undocu-mented aliens cannot be treated as a suspect class." *Id.* at 1308-09 (cleaned up) (quoting *Plyler*, 457 U.S. at 223); *see also Szymakowski v. Utah High Sch. Activities Ass'n, Inc.,* 756 F. Supp. 3d 1238, 1251 (D. Utah 2024) (refusing to find that the Eleventh Circuit followed *LeClerc* as ap-plied to F-1 visa holders because *Estrada* "is more properly seen as a case about undocumented aliens"). Indeed, *Estrada* cites *LeClerc* for the point that the parties there "illegally" are not the kind of "aliens" who have "rights and responsibilities they enjoy" that must be "reconcile[d]" with their lack of political capacity. 917 F.3d at 1310. But F-1 visa holders have rights and responsibilities they enjoy, too, including the express right of employment. The citation of *Estrada* to *LeClerc* simply does not work for this case.

Meanwhile, *Estrada* distinguishes *Graham* not on the basis that *Graham* is somehow limited to residents, but that it was limited to legally admitted "aliens." 917 F.3d at 1308-09. In contrast, *Estrada* held, "un-documented aliens cannot be treated as a suspect class." *Id.* (quoting *Phy-ler*, 457 U.S. at 223). Further distinguishing *Nyquist* and *Graham*, this

Court clarified that *Nyquist* and *Graham* "struck at the noncitizens' ability to exist in the community, a position seemingly inconsistent with the congressional determination to admit the alien to permanent residence." *Id.* (quoting *Foley*, 435 U.S. at 295). But, as explained above in Section II, and regardless of whether federal preemption exists, F-1 visa holders were also deemed by the federal government to exist in the community, in particular with respect to employment. Distinguishing *Nyquist* and *Graham* works when it comes to illegal immigrants, but not when it comes to legal F-1 visa holders.

### C.    SB 846 fails any level of scrutiny.

Regardless of whether strict scrutiny or some lesser amount of scrutiny applies, SB 846 does not pass muster. As noted above, *Nyquist* and *Graham* confirm that the preemption analysis and the Equal Protection analysis are interrelated.

Even rational scrutiny requires "a legitimate government purpose—a goal—which the enacting government body could have been pursuing." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (emphasis omitted). And even if Florida can regulate the employment rights of F-1 visa holders, *Nyquist* and *Graham* make plain that "[c]ontrol over

immigration and naturalization is entrusted exclusively to the Federal Government, and a State has no power to interfere." *Nyquist*, 432 U.S. at 10. But, as the District Court correctly noted in performing its preemption analysis, the only rationale the legislature has invoked for SB 846 was the "safety or security *of the United States or its residents*." Op. at 29 (quoting Fla. Stat. § 288.860(3)(d) (emphasis District Court's).

Florida simply has no legitimate public purpose in limiting Chinese F-1 visa holders from holding state employment, as permitted by their visas, unless the Board of Governors find that the employment is "not detrimental to the safety or security of the United States or its residents." Fla. Stat. § 288.860(3)(d). And Florida can assert no other, legitimate reason for requiring such a finding by the Board of Governors before permitting Chinese F-1 visas to hold such employment.

Of course, if strict scrutiny applies, the Board cannot meet that heightened standard either. SB 846 does not "actually further[]" any compelling interest. *Holt v. Hobbs*, 574 U.S. 352, 364 (2015). Also fatal is that SB 846's discriminatory restrictions are not narrowly tailored through the least restrictive means available. *Bernal*, 467 U.S. at 219. SB 846 does not limit its prohibitions to Communist members, in line with SB

50

846's express and purported compelling interest, or to Chinese government officials. Instead, SB 846 targets individual domiciled in China or six other countries, so long as they are neither a United States citizen nor a green card holder. Fla. Stat. §§ 288.860(1)(a), (b)(4); Fla. Univ. Bd. Governors Reg. §§ 9.012(1)(d), (f)(4).

## IV.    The case should be remanded for the discrete purpose of determining the proper scope of the injunction following *CASA*.

The scope of the injunction in this case was decided by the District Court prior to the Supreme Court's decision in *Trump v. CASA*, --- S. Ct. ----. 2025 WL 1773631 (Jun. 27, 2025). That case decided that, pursuant to the Judiciary Act of 1789, the asserted power of a district court to issue a truly "universal" injunction against anyone anywhere "likely exceed the equitable authority that Congress has granted to federal courts," *id.* at *4. Whether a statewide injunction is permitted here turns on whether the different language of a distinct, later-in-time, rights-enforcing statute, 42 U.S.C. § 1983, permits such relief—a question not addressed in *CASA*. Because issues of first impression should be addressed in the first instance to the District Court, the Students believe the Court should remand this case to determine the proper scope of the injunction after

51

CASA. *Cf. Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1205 (11th Cir. 2021) (following Supreme Court remand and grant of rehearing, noting that "like the Supreme Court, we recognize that 'what relief, if any, is appropriate in the present case is a matter for the District Court to decide in the first instance'").

## V.    The remaining injunction factors favor an injunction.

The Board's only arguments related to the other injunction factors (at 43-44), are simply repetitions of its argument that a universal injunction is not appropriate. This argument fails for the reasons stated in Section IV, above.

## CONCLUSION

This Court should affirm the District Court's Order and Preliminary Injunction, except as to scope. On scope, this Court may remand to the District Court to redetermine the proper scope of the injunction in light of *CASA*.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees believe oral argument is unnecessary as the decision of the District Court is correct except for the scope of injunction issue, which should be remanded back to the District Court to decide under new Supreme Court precedent in the first instance. Of course, Plaintiffs-Appellees are happy to participate in oral arguments and answer any questions the Court may have.

Respectfully submitted,

| | |
|---|---|
| July 2, 2025<br><br>/s/ *Justin Sadowsky*<br>Justin Sadowsky<br>CHINESE AMERICAN LEGAL DEFENSE ALLIANCE<br>4250 N. Fairfax Drive #600<br>Arlington, VA  22203<br>(646) 785-9154<br>justins@caldausa.org<br><br>*Counsel for Plaintiffs-Appellees* | Daniel Tilley<br>ACLU FOUNDATION OF FLA.<br>4343 West Flagler St., #400<br>Miami, FL 33134<br>(786) 363-2714<br>dtilley@aclufl.org |

53

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIRE-MENTS

1.     This document complies with the word limit of Fed. R. App. P. 29(E)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,348 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface, using Microsoft Word in 14-point Century Schoolbook font.

/s/ *Justin Sadowsky*
Attorney for Plaintiffs-Appellees

Dated: July 2, 2025