No. 25-11027

# In the United States Court of Appeals for the Eleventh Circuit

ZHIPENG YIN, ET AL.,
*Plaintiffs-Appellees,*

V.

COMMISSIONER, FLORIDA
DEPARTMENT OF EDUCATION, ET AL.,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of Florida
No. 1:24-cv-21129-JEM-EIS

## APPELLANTS' REPLY BRIEF

JAMES UTHMEIER
  *Attorney General of Florida*

JEFFREY PAUL DESOUSA
  *Acting Solicitor General*
NATHAN A. FORRESTER
  *Chief Deputy Solicitor General*
ROBERT S. SCHENCK
CHRISTINE PRATT
  *Assistant Solicitors General*
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*jeffrey.desousa@myfloridalegal.com*

July 23, 2025                    *Counsel for Defendants-Appellants*

*Yin v. Commissioner*
*Eleventh Circuit Case No. 25-11027*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Defendants certify that, to the best of their knowledge, the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 to 26.1-3:

1. Arcila, Fabio

2. Barnett, Ashley Bell

3. Cerio, Tim

4. Chinian, Saba

5. Costello, David

6. DeSousa, Jeffrey

7. Diaz, Manny

8. Edge, Aubrey

9. Forrester, Nathan

10. Guan, Zhengfei

11. Guo, Zhen

12. Haddock, Edward

13. Henry, Chad

14. Hitchcock, Jack

15. Jones, Ken

16. Lamb, Brian

C-1 of 3

17.    Levine, Alan

18.    Lydecker, Charles

19.    Mateer, Craig

20.    Martinez, The Honorable Jose E.

21.    Oliva, Jose

22.    Pang, Evelyn

23.    Perez, David

24.    Phalin, Amanda

25.    Pratt, Christine

26.    Rodrigues, Raymond

27.    Sadowsky, Justin

28.    Sanchez, The Honorable Eduardo

29.    Schenck, Robert

30.    Silagy, Eric

31.    Swartz, Rodney

32.    Tilley, Daniel Boaz

33.    Uthmeier, James

34.    Whitaker, Henry

35.    Yin, Zhipeng

36.    Zhu, Keliang

*Yin v. Commissioner*
*Eleventh Circuit Case No. 25-11027*

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Argument ................................................................................................................... 1

I.    Plaintiffs have failed to show that they are likely to succeed on the
      merits. ............................................................................................................... 2

    A.    The student Plaintiffs lack standing because FIU, not the
        Board of Governors, is responsible for their alleged injuries .................... 2

    B.    The F-1 visa program does not preempt SB 846. ......................................... 6

    C.    SB 846 does not violate the Equal Protection Clause. .............................. 13

II.   The motions panel correctly concluded that the universal
      injunction exceeds the equitable powers of the district court. ........................... 20

III.  The balance of the equities and the public interest do not support
      a preliminary injunction. ................................................................................. 23

Conclusion ............................................................................................................... 23

Certificate of Compliance ....................................................................................... 25

Certificate of Service ............................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. United States*,
  567 U.S. 387 (2012) ...................................................................................6

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993) ..................................................................................18

*Brnovich v. Democratic Nat'l Comm.*,
  594 U.S. 647 (2021) ..................................................................................19

*Chamber of Com. of U.S. v. Whiting*,
  563 U.S. 582 (2012) ............................................................................... 6, 9

*City of El Cenizo v. Texas*,
  890 F.3d 164 (5th Cir. 2018) ......................................................................9

*City of South Miami v. Governor of Fla.*,
  65 F.4th 631 (11th Cir. 2023) .............................................................. 2, 3, 4

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ....................................................................................5

*Club Madonna Inc. v. City of Miami Beach*,
  42 F.4th 1231 (11th Cir. 2022) .................................................................13

*Dandamudi v. Tisch*,
  686 F.3d 66 (2d Cir. 2012) ........................................................................16

*Dandridge v. Williams*,
  397 U.S. 471 (1970) ..................................................................................19

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ....................................................................................4

*Doe v. City of Albuquerque*,
  667 F.3d 1111 (10th Cir. 2012) .................................................................13

*Estrada v. Becker*,
  917 F.3d 1298 (11th Cir. 2019) ....................................................... 15, 16, 17

*Faculty Senate of Florida International University v. Winn,*
  616 F.3d 1206 (11th Cir. 2010) ...............................................................11

*FCC v. Beach Commc'ns, Inc.,*
  508 U.S. 307 (1993) ...............................................................................20

*Foley v. Connelie,*
  435 U.S. 291 (1978) ...............................................................................14

*Geduldig v. Aiello,*
  417 U.S. 484 (1974) ...............................................................................18

*Gordon v. Washington,*
  295 U.S. 30 (1935).................................................................................22

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.,*
  992 F.3d 1299 (11th Cir. 2021) ..............................................................19

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.,*
  527 U.S. 308 (1999) ...............................................................................20

*Hillsborough Cnty. v. Automated Med.,*
  *Lab'ies*, 471 U.S. 707 (1985) ....................................................................9

*Jacobson v. Fla. Sec'y of State,*
  974 F.3d 1236 (11th Cir. 2020) ........................................................2, 3, 5

*Lawrence v. Texas,*
  539 U.S. 558 (2003) ...............................................................................20

*League of United Latin Am. Citizens ("LULAC") v. Bredeson,*
  500 F.3d 523 (6th Cir. 2007) ..................................................................15

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State,*
  32 F.4th 1363 (11th Cir. 2022)................................................................18

*LeClerc v. Webb,*
  419 F.3d 405 (5th Cir. 2005) .............................................................15, 16

*Maine Forest Products Council v. Cormier,*
  51 F.4th 1 (1st Cir. 2022).......................................................................10

*Mathews v. Diaz*,
   426 U.S. 67 (1976)..................................................................................16

*Mertens v. Hewitt Assocs.*,
   508 U.S. 248 (1993) ...............................................................................22

*Moody v. Netchoice*,
   603 U.S. 707 (2024) ...............................................................................13

*Morales Feliciano v. Rullan*,
   378 F.3d 42 (1st Cir. 2004).....................................................................23

*N.Y. State Dep't of Soc. Servs. v. Dublino*,
   413 U.S. 405 (1973) .................................................................................7

*Odebrecht Constr., Inc. v. Secretary, Fla. Dep't of Transp.*,
   715 F.3d 1268 (11th Cir. 2013)..............................................................10

*Ortiz–Bouchet v. U.S. Att'y Gen.*,
   714 F.3d 1353 (11th Cir. 2013)..............................................................22

*Plyler v. Doe*,
   457 U.S. 202 (1982) ...............................................................................15

*Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*,
   485 U.S. 495 (1988) .................................................................................9

*Regents of the Univ. of Calif.*,
   591 U.S. 1 (2020)....................................................................................17

*Shen v. Simpson*,
   687 F. Supp. 3d 1219 (N.D. Fla. 2023)...................................................15

*Soskin v. Reinertson*,
   353 F.3d 1242 (10th Cir. 2004) ..............................................................14

*Support Working Animals v. Governor of Fla.*,
   8 F.4th 1198 (11th Cir. 2021)...................................................................2

*Swain v. Junior*,
   961 F.3d 1276 (11th Cir. 2020) ..............................................................23

*Taggart v. Lorenzen*,
    587 U.S. 554 (2019) ..................................................................22

*Trump v. CASA, Inc.*,
    No. 24A884, 606 U.S. ___,
    2025 WL 1773631 (U.S. June 27, 2025) ...............................1, 3, 20, 21, 22, 23

*United States v. Carolene Prods. Co.*,
    304 U.S. 144 (1938) ..................................................................15

*United States v. Florida*,
    682 F. Supp. 3d 1172 (S.D. Fla. 2023)..............................................4

*United States v. Hansen*,
    599 U.S. 762 (2023) ..................................................................13

*United States v. Rahimi*,
    602 U.S. 680 (2024) ..................................................................13

*United States v. Tongo*,
    No. 93–5326, 1994 WL 33967 n.1 (6th Cir. Feb. 7, 1994) ...........................8

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ..................................................................17

*Washington v. Davis*,
    426 U.S. 229 (1976) ..................................................................17

*Zschernig v. Miller*,
    389 U.S. 429 (1968) .................................................................. 10, 11

## Statutory Provisions

8 U.S.C. § 1101..................................................................10

8 U.S.C. § 1227...................................................................8

8 U.S.C. § 1324a..................................................................8

8 U.S.C. § 1621..................................................................12

8 U.S.C. § 1622.............................................................. 11, 12

v

42 U.S.C. § 1983 ........................................................................................21, 22

Fla. Stat. § 112.311............................................................................... 3, 5

Fla. Stat. § 288.860...........................................................................1, 14, 19

**Regulations**

8 C.F.R. § 214.2........................................................................................7, 8, 12

8 C.F.R. § 236.23 ...............................................................................................17

Deferred Action for Childhood Arrivals,
    87 Fed. Reg. 53152 (Aug. 30, 2022) .............................................................17

**Other Authorities**

Brief for the United States as Amicus Curiae, *Wallace v. Calogero*, Nos. 05-1645, 06-11
    (U.S. May 23, 2007), 2007 WL 1520968.........................................................16

*Chinese Nationals Charged with Conspiracy and Smuggling a Dangerous Biological Pathogen into
    the U.S. for their Work at a University of Michigan Laboratory*, U.S. Dep't of Justice (June
    3, 2025) ....................................................................................................18

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933 (2018)..................2

## ARGUMENT

In their brief, Plaintiffs struggle to justify the district court's injunction against SB 846. They do not establish their standing, that Congress intended to preempt laws like SB 846, or that Florida's law violates the Equal Protection Clause. Nor can they provide a persuasive post hoc rationalization for the district court's universal injunction, which a motions panel stayed based on *Trump v. CASA, Inc.*, No. 24A884, 606 U.S. ___, 2025 WL 1773631 (U.S. June 27, 2025). Still, Plaintiffs ask this Court to functionally nullify the law of a sovereign state. So they lard their brief with bald assertions and cheeky labels, hoping the Court will careen past the time-tested legal doctrines of standing, the presumption against preemption, and prior-panel precedent.

Taking a second to slow down, however, reveals that Plaintiffs have hidden the real issues. Florida's SB 846 does *not* prevent public universities in Florida from employing a "foreign principal" who possesses an F-1 visa. It merely requires approval by the State University System's Board of Governors. The Board can grant approval if the employment would be "valuable to students and the state university" and "not detrimental to the safety or security of the United States or its residents." Fla. Stat. § 288.860(3)(d). But the only way the Board can do so is if the public university that sponsored the foreign principal's F-1 visa first seeks approval from the Board. That never happened here: The university at which Plaintiffs seek employment—Florida International University ("FIU")—never applied on behalf of Yin or Guo.

This Court should reverse.

**I.    Plaintiffs have failed to show that they are likely to succeed on the merits.**

**A.    The student Plaintiffs lack standing because FIU, not the Board of Governors, is responsible for their alleged injuries.**

On standing, this case is a familiar tale: Plaintiffs have sued the wrong parties. They sued the members of the Board, but the Board is powerless to grant them relief without an application to approve. The Board cannot force FIU to submit an application, nor can it relieve FIU of its independent obligation to enforce SB 846. The injuries of which Yin and Guo complain—the refusal to hire them for on-campus employment—are traceable only to FIU and not redressable by the Board. Yin and Guo have thus failed to establish two of the three requisites for Article III standing. This Court has dealt with this precise scenario time and time again—repeatedly denying standing to plaintiffs who sue the wrong government officers. *See, e.g.*, *Support Working Animals v. Governor of Fla.*, 8 F.4th 1198, 1202–03 (11th Cir. 2021); *City of South Miami v. Governor of Fla.*, 65 F.4th 631, 640–41 (11th Cir. 2023); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1255 (11th Cir. 2020).

Yin and Guo seek to paper over this deficiency with the assertion that their "injuries all flow directly from SB 846." Ans. Br. 15. This reasoning partakes of the same "writ-of-erasure" fallacy that led to the erroneous imposition of the universal injunction here. *See* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 933 (2018). Courts do not enjoin or "erase a duly enacted law from the statute books"; their power is "more limited." *Jacobson*, 974 F.3d at 1255. The federal courts possess only the

2

power to "restrain the actions of *particular* officers against *particular* plaintiffs," *Trump v. CASA, Inc.*, No. 24A884, 606 U.S. ___, 2025 WL 1773631, at *6 (U.S. June 27, 2025), and specifically to restrain those "officials from taking steps to enforce a statute," *Jacobson*, 974 F.3d at 1255. The party that enforced SB 846 against Yin and Guo is FIU.

Alternatively, Plaintiffs seek to solidify standing from the Board's ability to sanction state universities. Ans. Br. 15. That authority causes their injury, as Plaintiffs see it, because a state university can be sanctioned if they hire a foreign principal without going through the allegedly "arduous and time-consuming administrative burdens to request an SB 846 exemption." *Id.* But contrary to Plaintiffs' representations, the Board does not "require[]" FIU to seek approval before hiring foreign principals; SB 846 does. Ans. Br. 16. "Local [and state] officials have an independent obligation to follow the law" in Florida. *City of South Miami*, 65 F.4th at 643 (citing Fla. Stat. § 112.311(6)). So even if the Board were enjoined from acting under SB 846, there is no evidence that FIU would then employ the student Plaintiffs. To conclude otherwise, one must assume that FIU would disobey the law (i.e., shirk its obligation to seek Board approval) absent the threat of sanction. "[T]he record [here] does not establish that it is likely that officers will . . . violate the law." *City of South Miami*, 65 F.4th at 643. It is FIU's inaction, rather than the Board's inaction, that spawned any injuries the student Plaintiffs assert.

Faced with that reality, Plaintiffs try to cabin *City of South Miami*. Plaintiffs claim that this Court found traceability lacking only because "[t]he state's enforcement role required the state to invoke judicial process against local officials." Ans. Br. 16. Because

3

the Board need not turn to the courts to enforce SB 846, Plaintiffs say, *City of South Miami* is inapplicable. *Id.* But that case involved two alternative theories of traceability against the Governor, both of which were rejected. True enough, this Court rejected the first theory (which relied on the Governor's ability to "sue local officers to *enforce compliance with*" state law) because the Governor had to resort to "judicial process" to enforce the relevant statute. *City of South Miami*, 65 F.4th at 642. But under the second, independent theory of standing, the plaintiffs claimed that their injury was traceable to the Governor's ability to suspend local officials. *Id.* Though the Governor could suspend officials without turning to the courts, that gubernatorial power was just as insufficient to support standing because those "[l]ocal officials have an independent obligation to follow the law," and the record never revealed that the Governor "would use his suspension authority to" cause the plaintiffs' harms. *Id.* at 643. So too here.

Yin and Guo appear to presume that FIU will employ them if the Board cannot disapprove their applications. But "[a] permissible theory of standing does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *United States v. Florida*, 682 F. Supp. 3d 1172, 1193 (S.D. Fla. 2023) (quotation omitted); *see also Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). Yin and Guo assume that FIU will employ them because "FIU actually did offer [Plaintiffs Yin and Guo] academic employment, before expressly rescinding those offers solely due to SB 846." Ans. Br. 18. That second clause, however, is rank speculation. All we know from the record is that FIU "deferred" its

4

offers to Yin and Guo pending completion of the SB 846 process. DE20-8 at 2 (Guo); DE20-15 at 2 (Yin). For reasons unknown, FIU then never submitted applications on their behalf to the Board (nor did it hire them during the several months that the Board has been enjoined), DE26-1 at 2, indicating that FIU may have thought better of its offers for reasons unrelated to SB 846. Plaintiffs also presume that FIU would ignore SB 846 and employ them anyway, because "a state officer's noncompliance with a law whose enforcement has been enjoined is not disobedience." Ans. Br. 17. But again, a court does not "enjoin a law"; it enjoins persons. Without an injunction against it, FIU must heed SB 846. Fla. Stat. § 112.311(6).

Finally, Plaintiffs claim that there must be standing against the Board because "no remedy is available against FIU." Ans. Br. 17.[1] But that argument, a twist on the familiar lament that if Plaintiffs "have no standing to sue, no one would have standing," "is not a reason to find standing" against the Board. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 420 (2013). What remedies could be available against FIU in a hypothetical lawsuit says nothing about whether enjoining members of the Board—Defendants here—would provide redress. It is the student Plaintiffs' burden to establish their

---

[1] Plaintiffs go to pains to prove that the Board members are "proper defendants" under *Ex Parte Young*. Ans. Br. 19–20. Yet again Plaintiffs muddle the issues. "Article III standing and the proper defendant under *Ex parte Young* are separate issues." *Jacobson*, 974 F.3d at 1256 (cleaned up). As this Court explained in *Jacobson*, a proper defendant under *Ex parte Young* is one that has "'some connection' with the enforcement of the challenged law," whereas "standing requires that the plaintiff's injury be 'fairly traceable' to the defendant's actions and redressable by relief against *that* defendant." *Id.*

standing *against the Board*, not a lack of standing against FIU. As Yin and Guo themselves acknowledge, it must be "'the effect of the court's judgment on the defendant,' not on 'an absent third party' such as FIU, 'that redresses the plaintiff's injury, whether directly or indirectly.'" Ans. Br. 17. An injunction against the Board would redress nothing.

### B.    The F-1 visa program does not preempt SB 846.

On the merits, Plaintiffs fail to meet the "high threshold" to show that federal law preempts SB 846. *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2012) (plurality opinion). They at best point to federal policies that permit aliens to attend school in the United States and that remove federal penalties so that schools, if they choose, can hire F-1 students. But those federal policies say nothing about Florida's choice to establish modest guardrails on state employment, nor do they prove that the "clear and manifest purpose of Congress" was to wipe away state regulation. *Arizona v. United States*, 567 U.S. 387, 400 (2012). In lieu of addressing the presumption against preemption, Plaintiffs fashion a presumption *of* preemption by casually asserting that Congress could "explicitly clarify an intent that preemption not apply." Ans. Br. 36. That inversion of the presumption infects their entire analysis and causes Plaintiffs to see preemptive intent lurking in every nook and cranny of federal law.

Looking at the F-1 visa program through the lens of the presumption against preemption obliterates Plaintiffs' case. Congress designed everything about the F-1 visa program to preserve, rather than displace, a state's discretion over foreign students on state-run campuses. That discretion extends to on-campus employment and

accompanying consideration of security concerns. The F-1 visa program never guarantees admission to a university; the university controls that. If a university believes a specific alien poses a security concern, it may deny him admission. If a university believes that the F-1 visa program poses too much of a risk of foreign theft of valuable data or intellectual property, a university need not participate in the F-1 program at all. It thus strains credulity to propose that an F-1 visa suddenly eliminates a state's discretion to account for security concerns in hiring the visa holder for on-campus employment (of which the university need not alert the State Department) in sensitive research or technology programs.

Plaintiffs fire a bevy of arguments to undermine those truths. None works.

1. At the gate, Plaintiffs purport to find preemptive intent in the supposedly "comprehensive" language of the F-1 visa regulations. Ans. Br. 25–26. But those regulations span a single paragraph of fewer than 400 words and regulate on-campus employment in just three ways: location (employment must be "on the school's premises" or "at an off-campus location that is educationally affiliated with the school"); hours (employment "must not exceed 20 hours a week while school is in session"); and scope ("employment must be an integral part of the student's educational program" and must "not displace United States residents"). 8 C.F.R. § 214.2(f)(9)(i). Even if preemption could be "inferred merely from the comprehensive character" of federal law (it cannot, *N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 415 (1973)), a regulatory regime

shorter and less detailed than Dr. Seuss's *The Cat in the Hat* is far from comprehensive enough to defeat the presumption against preemption.

Plaintiffs attach inflated significance to the language that an F-1 student "may engage in any on-campus employment." Ans. Br. 26 (quoting 8 C.F.R. § 214.2(f)(9)(i)). They posit that this language reveals an intent to make student employment "part and parcel of the F-1 visa program" due to the "difficult[y]" of "get[ting] through a graduate program without being employed." Ans. Br. 27. That reading cannot be squared with the "severe[] restrict[ions] in terms of the number of hours that [foreign students] may work." *United States v. Tongo*, No. 93–5326, 1994 WL 33967, at *1 n.1 (6th Cir. Feb. 7, 1994). That reading is also inconsistent with DHS's recognition that schools may not always make on-campus employment available to aliens, in which case DHS allows F-1 visa-holders to seek off-campus employment for "severe economic hardship." *See* 8 C.F.R. § 214.2(f)(9)(ii)(D). A better reading of this permissive language ("may") is that it removes federal *penalties* for alien work. After all, employers are civilly and criminally liable for hiring aliens who lack work authorization, 8 U.S.C. § 1324a(e), (f), and an alien can lose his visa for working without authorization, 8 U.S.C. § 1227(a)(1)(C)(i). Permitting on-campus employment is obviously not the same thing as guaranteeing it. If any ambiguity remained between those two readings (it does not), the presumption against preemption would compel the latter.

To shore up their teetering preemption argument, Plaintiffs rely on regulations unrelated to employment. They inform this Court, for instance, that the F-1 visa

regulations establish the amount of vacation students can take and how to transfer schools. Ans. Br. 26. But that type of analysis approaches preemption at the wrong level of generality. In field preemption, "the relevant field should be defined narrowly," *City of El Cenizo v. Texas*, 890 F.3d 164, 177 (5th Cir. 2018); *see also Hillsborough Cnty. v. Automated Med. Lab'ies*, 471 U.S. 707, 715–16 (1985) (defining a field narrowly), and even in the less rare case of conflict preemption, "a high threshold must be met" to show that a state law "conflict[s]" with Congress's intent (or an agency's intent), *Whiting*, 563 U.S. at 607 (plurality opinion). Regulations unrelated to employment tell the Court precious little about a preemptive intent to wipe away state regulation of employment like SB 846.

If taken seriously, Plaintiffs' fantastical preemption arguments would do more than just wipe away regulations of employment here; they would hogtie States from regulating the F-1 visa experience at all. That cannot be right. Congress built the F-1 system to empower schools, not disable them. Whether schools are public or private, the F-1 visa program incorporates schools' existing educational programs and places the lightest limits on the discretion of schools to define the educational experience, typically to prevent abuse of the visa system by students. That feathery touch is not preemptive "merely because the federal provisions [a]re sufficiently comprehensive to meet the need identified by" federal authorities. *Automated Med. Lab'ies*, 471 U.S. at 717. A statute's comprehensiveness only matters if it reveals a "scheme [that] intentionally leaves a portion of the regulated field without controls." *Puerto Rico Dep't of Consumer*

*Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988). The F-1 regulations do no such thing.

2. Plaintiffs then turn in vain to *Maine Forest Products Council v. Cormier*, 51 F.4th 1 (1st Cir. 2022). There, the First Circuit read the H-2A visa program to confer an "implicit federal right [on] the employer to hire foreign laborers," despite a state law purporting to forbid that employment. *Id.* at 8, 10. That ruling is inapposite. First, unlike an H-2A visa, the primary purpose of an F-1 visa is to secure education, not employment. *See* 8 U.S.C. § 1101(a)(15)(f)(i). Second, the state law in *Maine Forest* interfered with the discretion of the employer to hire workers. 51 F.4th at 10. Here, the situation is the opposite: the State is the employer. Through SB 846, Florida exercises the hiring discretion granted to it by federal regulations, rather than interfering with it. To drive this point home, imagine if FIU were a private entity. Its decision to conduct a further security review of the aliens it hires would in no way violate federal law. So too with a state's control over its universities' hiring discretion.

3. Plaintiffs' foreign-affairs preemption analysis is equally flawed. They cite cases involving express foreign-affairs policies, Ans. Br. 31, such as *Odebrecht Construction, Inc. v. Secretary, Florida Department of Transp.*, 715 F.3d 1268 (11th Cir. 2013), which found a state law to be preempted because it conflicted with foreign policies expressed in positive law. 715 F.3d at 1287 & n.7 (declining to consider "dormant" foreign affairs theory). They also cite an outlier decision—*Zschernig v. Miller*, 389 U.S. 429 (1968)—striking down an unusual Oregon law that invited state courts to engage in "minute inquiries

10

concerning the actual administration of foreign law, into the credibility of foreign diplomatic statements, and into speculation whether the fact that some [persons] received delivery of funds [from a given foreign government] should not preclude wonderment as to how many may have been denied 'the right to receive [funds from that government].'" *Id.* at 435 (quotation omitted). This case is patently different.

SB 846 does not intrude upon or conflict with any express foreign policy or invite judicial scrutiny of particular foreign political regimes. It is more like the state statute in *Faculty Senate of Florida International University v. Winn*, 616 F.3d 1206 (11th Cir. 2010), which denied appropriations to support academic travel to certain foreign nations. This Court held that Florida's law no "more than incidentally" affected foreign affairs. *Id.* at 1211. Just like with academic employment, "[n]o federal statute or regulation expressly require[d] States to pay" for academic travel or said that "States [could ]not differentiate among foreign nations when it [came] to spending for academic travel." *Id.* at 1208. This Court concluded that "in the absence of clear guidance from Congress," the decision "to fund academic work in country 'A' but not country 'B' is not an impermissible sanction against 'B' and is not beyond a State's valid powers." *Id.* at 1210–11. And Florida does not demand "proof about the conduct of any foreign government or mak[e] a judgment about that conduct," because SB 846's "application" does not turn on the conduct of foreign governments at all. *Id.* at 1211.

4. Even if all that were wrong, Congress left the States discretion to determine whether to employ F-1 visa-holders under the Personal Responsibility and Work

11

Opportunity Reconciliation Act ("PRWORA"). PRWORA provides that "[n]otwithstanding any other provision of law," 8 U.S.C. § 1622(a), a state may determine eligibility for "postsecondary education" benefits, *id.* § 1621(c)(1)(B), for "nonimmigrant[s]" such as F-1 visa-holders, *id.* § 1622(a). Plaintiffs attempt to skirt that authorization by pointing out on-campus employment is not a "contract . . . provided . . . by appropriated funds of a State," Ans. Br. 36–37, as if those contracts were the only benefit PRWORA covers. PRWORA of course permits States to control many other types of benefits—including "postsecondary education" benefits like on-campus employment. *See* 8 U.S.C. § 1621(c)(1)(A)–(B). Plaintiffs then assert that on-campus employment should fall under PRWORA's exclusion for "contract[s] . . . for a nonimmigrant whose visa for entry is related to such employment in the United States," Ans. Br. 37, but fail to address the Board's careful explanation that this language most naturally refers to employment visas, not student visas, to which on-campus employment is "incident." Init. Br. 28 n.6 (quoting 8 C.F.R. § 214.2(f)(9)).

Nor does the Board's reading of PRWORA provide *carte blanche* to States to ignore federal regulations of on-campus employment. Ans. Br. 38. PRWORA permits States to determine whether an alien is eligible for public benefits, but federal law continues to regulate other aspects of those benefits. 8 U.S.C. § 1622(a). So States can choose whether to hire student aliens, but once those aliens are eligible and hired, States must comply with specific federal regulations of those benefits—such as how many hours aliens can work, where they can work, and the scope of employment.

12

5. If for no other reason, Plaintiffs' preemption claims fail because they bring a facial challenge, and they have not established that "*no set of circumstances* exists under which the [statute] would be valid." *United States v. Hansen*, 599 U.S. 762, 769 (2023).[2] Admission and on-campus employment are often offered in tandem because students routinely finance their education with on-campus employment. As a result, in many cases, the Board will have completed its review of a state university's application to approve a foreign student's on-campus employment before the university even offers that student admission. At that point, the State Department would not yet have had any opportunity to consider a student's F-1 visa application. The F-1 visa program cannot possibly be read to have any preemptive effect on SB 846 in these cases.

## C.    SB 846 does not violate the Equal Protection Clause.

In a last-ditch effort to support the injunction, Plaintiffs revive the equal protection claim that the district court itself rejected. Ans. Br. at 40–51. They claim that SB

---

[2] Plaintiffs suggest (at 39) that this standard, which derives from *United States v. Salerno*, 481 U.S. 739, 745 (1987), does not apply to facial preemption challenges because of *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022). In *Club Madonna*, a panel of this Court purported to follow the Tenth Circuit in rejecting application of the "no set of circumstances" test to facial challenges, treating it not as a "separate test" but merely as "descri[bing] the outcome of a facial challenge." *Id.* (quoting *Doe v. City of Albuquerque*, 667 F.3d 1111, 1123 (10th Cir. 2012)). But the Supreme Court has since rebuffed attempts to weaken *Salerno* in contexts outside the First Amendment, requiring the party asserting a facial challenge to "establish that no set of circumstances exists under which the [law] would be valid." *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (rejecting facial challenge because law was constitutional as applied to defendant); *see also Moody v. Netchoice*, 603 U.S. 707, 723 (2024).

846 is subject to heightened scrutiny because it (1) facially discriminates based on alienage; (2) uses domicile as a proxy to discriminate on the basis of race and national origin; and (3) is motivated by animus against people of Chinese race and national origin. None of these contentions is valid.

1. SB 846 classifies based on alienage because it excepts individuals who are citizens or lawful permanent residents (LPRs) of the United States from the law's reach. *See* Fla. Stat. § 288.860(1)(b)4. But that classification is subject to only rational-basis review for two reasons.

First, a denial of benefits under PRWORA is subject only to rational-basis review. *Soskin v. Reinertson*, 353 F.3d 1242, 1255 (10th Cir. 2004). Because academic employment for students is a "postsecondary education" benefit, limitations on such employment are subject to rational-basis review.

Second, the law exempts the only classification of aliens subject to strict scrutiny: LPRs.

The Supreme Court has made clear that "[i]t would be inappropriate . . . to require every statutory exclusion of aliens to clear the high hurdle of strict scrutiny, because to do so would obliterate all the distinctions between citizens and aliens, and thus depreciate the historic values of citizenship." *Foley v. Connelie*, 435 U.S. 291, 295 (1978). Simply put, not "all limitations on aliens are suspect." *Id.* at 294. The appropriate degree of scrutiny instead turns on the relationship between the alien and the United States.

At one end of the spectrum are illegal aliens, who "cannot be treated as a suspect class because their presence in this country in violation of federal law is not a 'constitutional irrelevancy.'" *Plyler v. Doe*, 457 U.S. 202, 223 (1982). Their "lack of legal voice"—the ground on which disparate treatment of a "'discrete and insular minorit[y]'" can be made subject to heightened judicial scrutiny—"is tied to their illegal presence." *Estrada v. Becker*, 917 F.3d 1298, 1310 (11th Cir. 2019) (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938)). At the other end of the spectrum are LPRs, discrimination against whom "the Supreme Court has reviewed with strict scrutiny." *LeClerc v. Webb*, 419 F.3d 405, 415 (5th Cir. 2005); *see League of United Latin Am. Citizens ("LULAC") v. Bredeson*, 500 F.3d 523, 532–33 (6th Cir. 2007). Such discrimination strikes "at the noncitizens' ability to exist in the community, a position seemingly inconsistent with the congressional determination to admit the[se] alien[s] to permanent residence." *Foley*, 435 U.S. at 295.

That leaves the middle ground of temporary aliens, like Plaintiffs here. The Fifth and Sixth Circuits have both held that the exclusion of such aliens from state benefits and privileges is subject to rational basis review. *LULAC*, 500 F.3d at 533 (permissible to limit driver's licenses to citizens and LPRs); *LeClerc*, 419 F.3d at 419–20 (permissible to limit Louisiana bar membership to citizens and LPRs). This distinction also tracks the Supreme Court's alienage cases, which have applied strict scrutiny to LPR classifications because of how LPRs and citizens mirror each other in ways that nonimmigrants and citizens do not. *See LeClerc*, 419 F.3d at 418 & nn.35–39; *see also Shen v.*

15

*Simpson*, 687 F. Supp. 3d 1219, 1240 (N.D. Fla. 2023) (adopting this distinction). Unlike other protected characteristics, alienage is not an inherent trait—it is a product of congressional enactments establishing different groups of aliens "with a wide-ranging variety of ties to this country." *Mathews v. Diaz*, 426 U.S. 67, 78–79 (1976). As the United States argued in opposition to certiorari in *LeClerc*, the Supreme Court's holding "that alienage classifications are subject to strict scrutiny cannot be divorced from the context in which it appeared," because nonimmigrant aliens "are present only temporarily and subject to restrictions, and they do not ordinarily have the same ties to this country as permanent residents." Brief for the United States as Amicus Curiae, *Wallace v. Calogero*, Nos. 05-1645, 06-11 (U.S. May 23, 2007), 2007 WL 1520968, at *16–17. Even the Second Circuit, which agrees with Plaintiffs, stated that "the Supreme Court has never explicitly applied strict scrutiny review to a statute discriminating against nonimmigrant aliens." *See Dandamudi v. Tisch*, 686 F.3d 66, 74 (2d Cir. 2012).

This Court's decision in *Estrada* settles this issue. There, the Eleventh Circuit "decline[d] to extend the Supreme Court's decisions concerning [permanent] resident aliens to different alien categories," quoting the Fifth Circuit case that distinguished between LPRs and nonimmigrants. *Estrada*, 917 F.3d at 1310 (quoting *LeClerc*, 419 F.3d at 419). That holding renders SB 846 subject to only rational-basis review.

Plaintiffs assert, however, that *Estrada* involved a different class of aliens: those protected by the federal Deferred Action for Childhood Arrivals (DACA) program. Ans. Br. 34, 48. But if anything, DACA recipients have an even better claim to legal

16

protection than temporary visa-holders, as they are eligible for work authorization and their status can be indefinite. *See* 8 C.F.R. § 236.23(a)(4); Deferred Action for Childhood Arrivals, 87 Fed. Reg. 53152, 53180 (Aug. 30, 2022) (no limit on the number of renewals of DACA status). As the DACA memorandum recognized, recipients "lacked the intent to violate the law, are productive contributors to our society, and know only this country as home." *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 10 (2020) (quotation omitted). Other regulations treat DACA recipients as "lawfully present for purposes of, and therefore eligible to receive, Social Security and Medicare benefits." *Id.* (quotation omitted). *Estrada* thus applies here as well.

2. Plaintiffs next contend that using the term "domicile" is "a proxy for national origin and race discrimination in violation of equal protection guarantees." Ans. Br. 41–42. The Court should reject this thinly veiled attempt at an end-run around *Washington v. Davis*, 426 U.S. 229 (1976), and *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977). Those cases held that a law is not "unconstitutional solely because it results in a racially disproportionate impact." *Arlington Heights*, 429 U.S. at 264–65. It is true that "[s]ometimes a clear pattern, unexplainable on grounds other than race, emerges from" a law that "appears neutral on its face." *Id.* at 266. "But such cases are rare." *Id.* The common thread in those "rare" cases is that the official action is "unexplainable on grounds other than race." *Id.* In other words, "[s]ome activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people,

17

an intent to disfavor that class can readily be presumed." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). For example, "[a] tax on wearing yarmulkes is a tax on Jews" because only Jews wear yarmulkes and there is no other reason to draw that classification. *Id.* The Supreme Court has held that even classifications based on pregnancy are not necessarily a proxy for sex, explaining that "[w]hile it is true that only women can become pregnant," "pregnancy is an objectively identifiable physical condition with unique characteristics" that can be rationally distinguished. *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974), *superseded by statute on other grounds.*

Here, domicile is not a proxy for race or national origin. That status is used in SB 846 as an indicator of one who might be prone to the influence of totalitarian governments, which is not as farfetched a possibility as Plaintiffs paint it. *See Chinese Nationals Charged with Conspiracy and Smuggling a Dangerous Biological Pathogen into the U.S. for their Work at a University of Michigan Laboratory*, U.S. Dep't of Justice (June 3, 2025), https://tinyurl.com/mcfs6aba. As a result, SB 846's use of domicile does not even approach the irrational object of disfavor needed to treat that classification as a proxy for discrimination based on national origin or race.

3. Equally unconvincing is Plaintiffs' half-hearted attempt (at 44–45) to establish discriminatory intent. They offer no persuasive evidence that comes close to overcoming "the presumption of legislative good faith" that attends any inquiry into legislative intent. *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022). The district court found no legislative animus on this record. DE43 at 36–

18

37. That finding is subject only to this Court's review for clear error, *see Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 687 (2021) (such findings must be upheld if "plausible in light of the entire record"), and it was plainly correct.

At best, Plaintiffs question why the Legislature would "include people who live in China but who are not members of the Chinese Communist Party." Ans. Br. 44. The answer is easy: the Legislature rationally desired to prevent circumvention by totalitarian governments bent on using their residents' connection to the country to manipulate them. And while tailoring is not required to survive rational-basis review, SB 846 is in fact quite well-tailored. It does not impose a categorical prohibition on the employment of students domiciled in foreign countries of concern; it authorizes the Board to waive the statutory bar in every case. *See* Fla. Stat. § 288.860(3)(d).

Just as baseless is Plaintiffs' argument (made for the first time on appeal) that discriminatory intent can be inferred from the Legislature's decision not to explicitly cover "agents, spies, and diplomats" of a foreign country of concern who "could often live abroad." Ans. Br. 45. Plaintiffs ignore that those individuals will generally be "official[s] of" or "member[s] of a political party" in that country, which SB 846 covers regardless of domicile. *See* Fla. Stat. § 288.860(1)(b)1.–2. Their argument says nothing about discriminatory intent, moreover, because Plaintiffs' "alternative" of including such agents even when they have established domicile away from their country would not "lessen any potentially discriminatory impact." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1327 (11th Cir. 2021). In all events, a law does

not violate the Equal Protection Clause "merely because the classifications made by its laws are imperfect." *Dandridge v. Williams*, 397 U.S. 471, 485 (1970).

4. Finally, Plaintiffs claim that SB 846 fails even the low threshold of rational-basis review. Their burden to succeed on this claim is high: they must "negative every conceivable basis which might support" the law, and the reason that "actually motivated the legislature" is "entirely irrelevant for constitutional purposes." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (quotation omitted). They do not come close to meeting this burden. The State has at least two conceivably legitimate reasons for passing SB 846 aside from national security—promoting State security and ensuring the integrity of its educational institutions—and either interest provides ample basis for the constitutionality of SB 846. Ignoring the latter interests, Plaintiffs advance the astonishing contention that the State has no interest in preserving the "safety or security of the United States." Ans. Br. 50 (quotation omitted). They cite no support for that assertion. But States can and should be concerned with preserving national security. *See Lawrence v. Texas*, 539 U.S. 558, 585 (2003) (O'Connor, J., concurring in the judgment) (describing "national security" as a legitimate state interest). Fortunately, Florida is.

## II.   The motions panel correctly concluded that the universal injunction exceeds the equitable powers of the district court.

Even if the Court disagrees on the merits, the district court erred in awarding universal relief to benefit non-parties. The equitable authority of "the federal courts is that 'traditionally accorded by courts of equity' at the time of our founding." *CASA*,

2025 WL 1773631, at *13 (quoting *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)). In the Judiciary Act of 1789, Congress "granted federal courts no such power" to grant universal relief, *id.* at *6, which is redress beyond what is necessary to provide "complete relief *between the parties*," *id.* at *11 (quotation omitted). "Nothing like a universal injunction was available at the founding, or for that matter, for more than a century thereafter. Thus, under the Judiciary Act, federal courts lack authority to issue them." *Id.* at *13.

The district court based its injunction in (1) suits involving immigration issues and (2) suits seeking statewide relief. *See* DE61 at 2. *CASA* closes the door on such exceptions. *CASA* explains that the relevant test is whether the scope of an injunction is necessary to provide "complete relief *to the plaintiffs*," *CASA*, 2025 WL 1773631, at *11, and that "the policy pros and cons" (such as whether immigration law should be uniform) "are beside the point," *id.* at *13. At core, the problem with universal relief is not "*where* it applies, but *whom* it protects"; thus "the term 'universal' better captures" the problem than "nationwide." *Id.* at *4 n.1. While courts "may administer complete relief between the parties," any benefit to non-parties must be "merely incidental" to granting relief to the parties. *Id.* at *11 (quotation omitted). For that reason, a motions panel of this Court correctly stayed the injunction to the extent it applied beyond the student Plaintiffs, citing *CASA. See* Order, *Yin v. Comm'r*, No. 25-11027 (11th Cir. July 10, 2025), ECF No. 27-2.

For the first time on appeal, Plaintiffs labor to shoehorn universal equitable authority into 42 U.S.C. § 1983. Ans. Br. 51.[3] That argument sinks upon even a cursory reading of *CASA*. Plaintiffs purport to find contrast between the Judiciary Act—granting federal courts jurisdiction "over 'all suits . . . in equity'"—and Section 1983—permitting "suit[s] in equity" to enforce federal rights. Curiously absent from their brief is how that language differs in any meaningful way; indeed, they fail to quote the text of those statutes at all. That absence is telling.

Section 1983 grants nothing more than general equitable power and mirrors the relevant equitable language in the Judiciary Act. Congress would have said a lot more in Section 1983 if it intended to disrupt longstanding principles of equity. *See Gordon v. Washington*, 295 U.S. 30, 36 (1935) ("[T]he phrase 'suits in equity' has been understood to refer to suits in which relief is sought according to the principles applied by the English Court of Chancery before 1789."). The boilerplate text of Section 1983, like that of many other statutes, brings the "old soil" with it and "incorporate[s] the traditional standards in equity practice." *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) (bankruptcy statute); *see also Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993) (Employee Retirement Income Security Act of 1974). If anything, Section 1983 is a weaker source for universal relief because its language is more party-specific than the Judiciary Act. *See*

---

[3] The Court need not remand that purely legal question, as Plaintiffs suggest. *See Ortiz–Bouchet v. U.S. Att'y Gen.*, 714 F.3d 1353, 1357 n.5 (11th Cir. 2013) (declining to remand on a question of statutory interpretation because the issue was "purely legal").

42 U.S.C. § 1983 (creating a cause of action to make a state actor "liable to the party injured."). *CASA* thus applies to this case with full force. *See Morales Feliciano v. Rullan*, 378 F.3d 42, 49–50 (1st Cir. 2004) (applying *Grupo Mexicano* to equitable remedies under Section 1983).

### III. The balance of the equities and the public interest do not support a preliminary injunction.

Finally, the remaining equitable factors also show that a preliminary injunction is improper. Any harm done to Plaintiffs Yin and Guo is outweighed by the harm done to the State and the public interest in preventing enforcement of a duly enacted law. *See Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020) ("balance-of-the-harms and public-interest factors . . . 'merge' when, as here, 'the Government is the opposing party'"). "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *CASA*, 2025 WL 1773631, at \*15 (quotation omitted).

## CONCLUSION

The Court should vacate the district court's injunction. At minimum, it should narrow that injunction insofar as it applies to non-parties.

Dated: July 23, 2025                              Respectfully submitted,

                                                  JAMES UTHMEIER
                                                    *Attorney General of Florida*

                                                  /s/ *Robert S. Schenck*
                                                  JEFFREY PAUL DESOUSA (FBN 110951)
                                                    *Acting Solicitor General*
                                                  NATHAN A. FORRESTER (FBN 1045107)
                                                    *Chief Deputy Solicitor General*
                                                  ROBERT S. SCHENCK (FBN 1044532)
                                                  CHRISTINE PRATT (FBN 100351)
                                                    *Assistant Solicitors General*
                                                  OFFICE OF THE ATTORNEY GENERAL
                                                  The Capitol, PL-01
                                                  Tallahassee, FL 32399
                                                  (850) 414-3300
                                                  *jeffrey.desousa@myfloridalegal.com*
                                                  *nathan.forrester@myfloridalegal.com*
                                                  *robert.schenck@myfloridalegal.com*
                                                  *christine.pratt@myfloridalegal.com*

                                                  *Counsel for Defendants-Appellants*

24

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,389 words.

2.      This document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

/s/ *Robert S. Schenck*
Assistant Solicitor General

25

## CERTIFICATE OF SERVICE

I certify that on July 23, 2025, I electronically filed this document with the Clerk of Court using the Court's CM/ECF system, which will send a notice of docketing activity to all parties who are registered through CM/ECF.

/s/ *Robert S. Schenck*
Assistant Solicitor General

26